## UNITED STATES v. JOHNSON.

### SAME v. SOMMERS et al.

#### No. 7500, 7501.

Circuit Court of Appeals, Seventh Circuit.

Sept. 15, 1941.

Rehearing Denied Nov. 6, 1941.

Floyd E. Thompson, of Chicago, Ill., for appellant Johnson.

John Elliott Byrne, Edward J. Hess, and George Callaghan, all of Chicago, Ill., for appellants Sommers and others.

J. Albert Woll, U. S. Atty., and Earle C. Hurley, Paul M. Plunkett, Lawrence J. Miller, and Edward J. Ryan, Asst. U. S. Attys., all of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

These appeals are from a judgment, entered on the verdict of a jury, finding the defendants guilty of a wilful attempt to evade the payment of income taxes, and of conspiracy to defraud the United States. The appellant in No. 7500 is William R. Johnson, and the appellants in No. 7501 (sometimes herein referred to as "co-defendants") are Jack Sommers, James A. Hartigan, John M. Flanagan, William P. Kelly and Stuart Solomon Brown. The indictment contains five counts, the first four of which charge Johnson with evasion of income taxes for the years 1936, 1937, 1938 and 1939, and are predicated upon Section 145(b), 26 U.S.C.A. Int.Rev.Code. As to the offenses alleged in these counts, the co-defendants (appellants in No. 7501) are charged as aiders and abettors. The fifth count charges all defendants with a conspiracy to defraud the United States of income taxes. 18 U.S.C.A. § 88.

In addition to the appellants in No. 7501, a number of others were charged as aiders and abettors. As to such others, the charge was nolle prossed as to William R. Skidmore, William Goldstein, Orrie Alexander and Bernice Downey. A verdict of not guilty was returned as to Andrew J. Creighton, Edward Wait and Reginald E. MacKay.

The trial commenced August 17, 1940, and the verdict of the jury was returned October 12, 1940. As might be expected in a trial of this duration, many complicated and difficult questions, both legal and factual, were presented. Many errors are here assigned which it is contended require a reversal of the judgment. After a lengthy and careful consideration of the voluminous record and briefs, we have reached the conclusion that the contention must be sustained. It would be impractical to consider all the errors assigned or contentions made by the respective parties, and we shall, therefore, discuss only those which we regard as of controlling importance.

The contested issues revolve largely around: (1) The denial of certain preliminary motions, (2) that the verdict of the jury is not supported by substantial, competent evidence, (3) the admission of improper evidence, (4) the improper examination and cross-examination of witnesses, (5) the improper and prejudicial remarks of the prosecutors, and (6) the denial by the court to include in its charge to the jury certain requests made by the defendants.

At the threshold of our consideration, we are confronted with the troublesome question arising from the court's denial of certain preliminary motions, pleas and demurrers invoked by the defendants. On May 16, 1940, there was filed on behalf of the defendant Johnson, what was entitled a motion to quash the indictment, and on the same date there was filed on behalf of the other defendants what was entitled a plea in abatement in the nature of a motion to quash. Both the motion and the

plea attacked for substantially the same reasons, the legality of the Grand Jury which returned the indictment. The defendants also filed a motion for rule on the Government to reply to such plea and motion, which was by the court denied. The Government filed a motion to strike the motion and plea as being insufficient in law, which motion was allowed.

The attack upon the Grand Jury was upon the ground that it was without jurisdiction for the reason that the indictment was returned at a term of court subsequent to that at which it had been originally empaneled, without compliance with the Statute in that respect.

The Grand Jury was empaneled for the December, 1939, Term.[1] This term continued until the first Monday in February; the February Term until the first Monday in March, and the March Term until the first Monday in April. The indictment was returned March 29, 1940, during the March Term.

On January 24, 1940, during the December, 1939, Term, the Grand Jury was authorized, by order entered on that date, to sit during the February, 1940, Term to finish investigations begun but not finished at the December Term. No question is raised but that this was a valid order and that the Grand Jury was legally continued from the December to the February Term.

The motion by Johnson to quash (the same may be said of the plea in abatement on behalf of other defendants) alleged that the indictment, returned at the March Term in the year 1940, was without warrant or authority of law for the reason that an order entered February 28, 1940, purporting to authorize the continuance of the Grand Jury from the February to the March Term was void. This order, as alleged in the motion, is as follows:

"Now comes the Second December Term 1939 Grand Jury for the Northern District of Illinois, Eastern Division, by Dorothy W. Binder, Forewoman, and in open Court requests that an order be entered authorizing them, the said Second December, 1939 Grand Jury, heretofore authorized to sit during the February 1940 Term of this Court, to continue to sit during the Term of Court succeeding the said February Term of Court, to-wit, the March 1940 Term of Court, to finish investigations begun but not finished by said Grand Jury during the said December 1939 and the said February 1940 Terms of this Court, and which said investigations cannot be finished during the said February 1940 Term of Court; and the Court being fully advised in the premises,

"It Is Therefore Ordered That the Second December 1939 Grand Jury, now sitting in this Division and District, be, and it is hereby authorized to continue to sit during the March 1940 Term of Court for the purpose of finishing said investigations."

This order, so it was alleged, was predicated upon a petition of the Grand Jury filed February 28, 1940, praying for a continuance order " * * * to finish investigations begun but not finished by said Grand Jury during the said December 1939 and the said February 1940 Term of this Court, and which said investigations cannot be finished during the said February 1940 Term of said Court."

The motion to quash as to the first, second and third counts of the indictment alleged that on March 1, 1940, the same Grand Jury returned an indictment against the defendant Johnson, charging the same crimes, matters and violations as are contained in the first, second and third counts of the instant indictment, and that— " * * * the matters contained in the first, second and third counts of the present and instant indictment were finished and concluded at the February 1940 Term of the said Grand Jury; * * *."

As to counts four and five, it was alleged that "no investigation of said matters was begun at the December 1939 Term," and "the investigation of said matters was first begun at said March 1940 Term of Court." It is the contention of the defendants that the order of continuance was not in compliance with Section 421, 28 U.S.C.A. This provision, so far as now material, provides: " * * * A district judge may, upon request of the district attorney or of the grand jury or on his own motion, by order authorize any grand jury to continue to sit during the term succeeding the term at which such request is made, solely to finish investigations begun but not finished by such grand

---

[1] The Terms for the District Court of the Eastern Division of the Northern District of Illinois are fixed by Statute, 28 U.S.C.A. § 152, to be held on the first Mondays in February, March, April, May, June, July, September, October and November, and the third Monday in December.

jury, but no grand jury shall be permitted to sit in all during more than three terms. * * *"

No question is raised by the Government but that compliance with this provision is essential in order to give a Grand Jury vitality subsequent to the term at which it is originally empaneled. Moreover, in view of the fact that all inferior courts of the United States are of limited jurisdiction and possess only such power and authority as are expressly conferred, no question could well be raised in this respect. As was said in Re Mills, Petitioner, 135 U.S. 263, 267, 10 S.Ct. 762, 763, 34 L.Ed. 107: " * * * A grand jury, by which presentments or indictments may be made for offenses against the United States is a creature of statute. It cannot be impaneled by a court of the United States by virtue simply of its organization as a judicial tribunal. * * *"

If a court is without authority to empanel a Grand Jury except as the same is expressly conferred by Statute, it would seem to follow inevitably that a Grand Jury empaneled could only have its authority or power continued to a subsequent term by strict compliance with the statutory provision. The language of the provision plainly limits the authority of the court to continue a Grand Jury to sit "during the term succeeding the term at which the request is made," and with equal clarity limits the continuance "solely to finish investigations begun but not finished by such grand jury."

It is contended by the defendants that the order of February 28, 1940, authorized the December Grand Jury to finish investigations begun during the February, 1940, Term when, under the statute, the court had the power only to authorize it to finish investigations begun at the December Term. The Government disputes that the order of the court can be thus construed, but does not argue the question. The language "to finish investigations begun but not finished by said Grand Jury during the said December 1939 and the said February 1940 Terms of this court" leaves no room for argument but that the March Grand Jury was authorized to continue investigations begun at its February Term, as well as those begun at the December Term. It is equally plain that by reason of the statutory limitation, the court was without power to confer upon the Grand Jury authority to continue investigations begun at

its February Term. The Government does not dispute—in fact, it, in effect, concedes—the soundness of this proposition.

The Government, however, in undertaking to meet the situation, relies upon an allegation of the indictment which purports to allege continuance of the Grand Jury, in conformity with the statute. (This allegation was attacked by demurrer as shown hereinafter). It is contended that by reason of this allegation, the question as to whether the Grand Jury was illegally continued to the March Term for the purpose of continuing an investigation begun at the February Term is academic. Reliance upon this allegation, in our judgment, places the Government in a precarious, if not fatal, situation. We are unable to discern how an illegal order of continuance can be cured or even aided by an allegation in the indictment to the effect that the Grand Jury was legally continued. The Government had an opportunity to answer the allegations of the motion to quash, but instead, entered a motion to strike, which was allowed. By such motion a legal question was presented which must be determined from the averments of the motion to quash.

In our view there can be no escape from the attack made upon the court's order except by blindly holding that the phrase "to finish investigations begun but not finished by said Grand Jury during the said December 1939 and the said February 1940 Terms" is valid as to the former and void as to the latter. We have been favored with no authority and we are unable to find any which would permit such a construction.

The Government also contends that by reason of the order of January 24, continuing the December Grand Jury to the February Term for the purpose of continuing any investigations begun at the December Term, that the Grand Jury at the February Term had no authority to begin any new investigation. Undoubtedly this is true, but we are unable to perceive how this furnishes any support for the order of February 28.

We are not greatly impressed with the defendants' argument that the Grand Jury was precluded from continuing an investigation during the March Term merely because of the fact that it, on March 1 (February Term) returned an indictment against Johnson charging the

same violations as were charged in the first, second and third counts of the instant indictment. True, a Grand Jury has no authority to continue an investigation which has been finished at a preceding term. While the return of an indictment might be an indication that the investigation was finished, we do not think it is conclusive. We see no reason why a Grand Jury is precluded from continuing an investigation after the return of an indictment, and subsequently again indict for the same offense.

The motion to quash with reference to the fourth and fifth counts of the indictment makes the direct allegation that the investigation of the matters therein charged was first begun at the March Term and that no such investigation was begun at the December Term. The fourth count charges the defendant Johnson on to-wit, March 15, 1940, with an attempt to defeat and evade his 1939 income tax (other defendants charged as aiders and abettors). One of the means alleged is the filing of an erroneous return on March 15, 1940. Other means are alleged, not material to the instant question. The fifth count charges all the defendants with a conspiracy from a period commencing about January 1, 1936, up to and including the return of the indictment. It appears that much of the discussion concerning these counts is interwoven with that in connection with the demurrer. It is the contention of the defendants that the offense charged in the fourth count was committed, if at all, on March 15, 1940. We think this is correct —in fact, the count so alleges. It is then argued that no investigation could have been begun prior to the date of the commission of the alleged offense, and therefore, not until the March Term. The Government takes issue with this contention and argues that the Grand Jury investigates facts, not offenses. It is pointed out that the Grand Jury was investigating Johnson's income for the years 1936 to 1938 inclusive, and could not avoid hearing facts which related to the same question for the calendar year 1939.

▮▮▮▮▮ There is some plausibility in this argument in view of the fact that each of the first four counts charges the same offense except for different years. It has been held, however, and we think correctly so, that an attempt to evade income tax is a separate offense for each year. United States v. Sullivan, 2 Cir., 98 F.2d 79,

80. In United States v. Miro, 2 Cir., 60 F.2d 58, 61, the court said: "* * * A tax could neither be evaded nor attempted to be evaded if it was not due; if, by the terms of the statute, there is no tax due in a particular case, there is no 'tax imposed by this act' to evade or defeat. * * *"

It appears to us that the language of the Statute "solely to finish investigations begun" must have reference to a legal investigation of an offense which has been committed. A Grand Jury is not a conservator of the peace. So far as we know, it has no authority to investigate offenses which it anticipates may be committed in the future. The mere fact that the Grand Jury had discovered evidence of tax evasion for previous years would give it no authority to presume that the same offense would be consummated in a later year. The fact that it heard testimony relative to offenses committed in previous years which might at some later time become relevant to an offense committed in the future, does not, in our judgment, sustain the argument that it could have begun an investigation as to such future offense. We think it is different with reference to the conspiracy count which was a continuing offense, an investigation of which the Grand Jury might have commenced at its December Term.

▮▮▮▮ Our discussion so far has been predicated upon our conclusion that the order of February 28, 1940, was void. If our conclusion in this respect be erroneous, it would not follow that the allowance of the motion to strike the motion to quash could be sustained. As pointed out, the motion as to the first, second and third counts expressly averred, as a matter of fact, that the investigations of the offenses charged in those counts "were finished and concluded at the February 1940 Term of the Said Grand Jury," and as to counts four and five, the averment was made that the investigation as to offenses therein charged was not "begun at the December 1939 Term of court" and was "first begun at said March 1940 Term of court." Assuming that the court entered a valid order of continuance, which we have decided to the contrary, the Grand Jury, according to the averments of the motion to quash, failed to comply with such order. We think it is plain that a Grand Jury, legally continued, has no authority to continue an investigation except one begun at

its original term and not finished either at the original term or an intervening subsequent term. The Government answers the argument as to these averments, by informing us as to the common practice of Grand Juries "engaged in a broad field of inquiry." This may be the most available answer, but legally it is a fiasco.

In defense of the Grand Jury proceeding, the Government relies upon a decision of this Court, Elwell v. United States, 7 Cir., 275 F. 775. While it does not expressly so contend, we assume it infers, by reason of what was said in that case, that the Grand Jury may be considered as de facto. While we are loath to repudiate a holding of our own court, we are of the view that there is no such thing as a de facto Grand Jury in a Federal Court. In the Elwell case, the court cites People v. McCauley, 256 Ill. 504, 509, 100 N.E. 182, which, it is true, recognizes such a Grand Jury. The latter court expressly points out, however, that a Circuit Court of Illinois has general and original criminal jurisdiction, with common law power to call or continue a Grand Jury. Its authority is not dependent upon Statute. A United States District Court, on the contrary, is of limited jurisdiction with such powers only as are expressly conferred. A Grand Jury is "a creature of statute." In re Mills, Petitioner, supra. Furthermore, the Elwell case was decided previously to the enactment of the amendment of Section 421 supra, which expressly limits the authority of the court to continue a Grand Jury. It affords no assistance in the instant case.

We are not unmindful of the rule invoked by the Government that pleas in abatement and those of a kindred nature must be strictly construed. Facts must be stated, not conclusions. Here, however, the allegations were direct and positive. It is difficult to see how they could have been more specific. The challenge went to the very heart of the authority of the Grand Jury to act. The Government's motion to strike should have been overruled and the Government required to answer. The defendants were entitled to an opportunity to offer evidence in support of the motion and plea. Carter v. Texas, 177 U.S. 442, 447, 20 S.Ct. 687, 44 L.Ed. 839.

Finally the Government relies upon Section 556, 18 U.S.C.A., which provides in substance that no indictment, trial, judgment or other proceeding shall " * * * be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant." This provision is not applicable —the question presented is one of substance and not of form. Crain v. United States, 162 U.S. 625, 644, 16 S.Ct. 952, 40 L.Ed. 1097.

In view of the importance of the case, the time consumed in its preparation and trial, as well as the expense relative thereto, we are reluctant to pronounce the action of the court as reversible error in striking the motion to quash and the abatement plea. We are forced to the conclusion, however, that there is no escape from such a pronouncement. As was said in Crain v. United States, supra, 162 U.S. 625, 644, 16 S.Ct. 959, 40 L.Ed. 1097: " * * * Nor ought the courts, in their abhorrence of crime, nor because of their anxiety to enforce the law against criminals, to countenance the careless manner in which the records of cases involving the life or liberty of an accused are often prepared. Before a court of last resort affirms a judgment of conviction of, at least, an infamous crime, it should appear affirmatively from the record that every step necessary to the validity of the sentence has been taken. * * * "

Notwithstanding that our conclusion in this respect requires a reversal of the judgment, we think it is proper to express our views concerning some of the other issues presented. Demurrers were filed to the indictment by all defendants attacking its sufficiency on numerous grounds, one of which is the alleged insufficiency of the allegation with reference to the continuance of the Grand Jury. The indictment in this respect alleged: " * * * having begun but not finished during said December Term of Court among other things an investigation of the matters charged in this indictment, and having continued to sit by order of this Court in and for said division and district during the February and March Terms of said Court for the purpose of finishing investigations begun but not finished during said December Term of Court, pursuant to request of the United States Attorney and upon motion of the Grand Jury, * * *."

The argument concerning this allegation naturally is interwoven to a considerable extent with that concerning the motion to quash. The most serious criticism is that it failed to allege that the investigation

was not finished at the February Term. It does allege, however, that the investigations were begun but not finished during the December Term, and that the Grand Jury was continued to the February and March Terms for the purpose of finishing such investigations. It could not well have been continued to the March Term for the purpose of finishing an investigation which had been finished at the February Term. While the allegation is not as certain as good pleading requires, yet we think it may be reasonably construed to exclude the thought that the investigation was finished at the February Term.

It is also asserted that the allegation is only contained in the first count of the indictment and even if sufficient, it has no application to the other counts which failed to incorporate the allegation by reference or otherwise. We do not believe this position is tenable. As we read the indictment, the allegation is part of what may be termed the preamble and specifically refers to the "matters charged in this indictment," which we think makes it applicable to all counts alike. It is argued that according to this allegation, only one order of court was entered continuing the December Grand Jury during the February and March Terms. True, the word "order" is used in the singular when it should have been in the plural, but we are not disposed to hold the allegation insufficient for that reason.

The fourth count of the indictment alleged the offense to have been committed on March 15, 1940. It is again argued that an investigation of this offense could not legally have been begun at the December Term, 1939. We have heretofore considered and sustained the validity of this argument. It follows that the demurrer, for this reason, should have been sustained as to the fourth count.

It is also urged that, assuming the sufficiency of the allegation with reference to continuance, the judgment must be reversed for the reason that no proof was offered in its support. While this question, of course, is not raised by demurrer, it is so closely related to our discussion concerning the continuance matter that it appears appropriate to consider it at this point. The Government makes no answer to the contention unless it be that the court takes judicial notice of its orders in support of jurisdictional allegations. How far the court may go in this respect we need not decide for the reason that such notice would have disclosed the Grand Jury was continued to the March Term, illegally as we have held, "to finish investigations begun but not finished * * * during the said December 1939 and the said February 1940 Term of this court." It is apparent that judicial notice of this order would not have supported the allegation. In fact, we have sustained the allegation because it is in substantial conformity with the statutory provision rather than the court's order. If the allegation was essential, as we think it was, it would seem equally essential to support it with proof. Failure to have proved venue, no doubt, would have been fatal to the judgment. We think failure to prove the allegation with reference to the authority of the Grand Jury to act is likewise fatal. This is especially true in the instant case where the Government relied upon it in order to escape facing the issue tendered by the motion to quash.

The position of the Government leads to the inevitable result that a Grand Jury may, with impunity, exceed the limitation which Congress has definitely and plainly placed upon its authority, to act at a succeeding term. Furthermore, its unauthorized acts are not subject to challenge and the Government can never be called upon to make proof that the Grand Jury has proceeded in compliance with law. When confronted with a motion to quash or plea in abatement, it relies upon an allegation of the indictment. When the latter is placed in issue by the defendant's plea, it offers no proof in support of the allegation, and the only excuse for its failure to do so is that the court takes judicial notice. There may be room for contrariety of opinion as to the precise manner in which the authority of a Grand Jury should be challenged, but we doubt if any will contend that the Government can wholly evade the challenge as has been done in the instant case. Failure of proof with reference to the allegation under discussion is, in our opinion, fatal to the judgment.

We now return to a further discussion of the demurrer. It is contended that various allegations of the indictment are inconsistent and duplicitous. The first four counts are the same, or substantially so, except as to dates and amounts. We shall discuss the first, and what is said will be equally applicable to the second, third and

fourth. The count charges, in the language of the statute, that the offense was committed on to-wit, the 15th day of March, 1937. It alleges facts disclosing that Johnson was required on or before March 15, 1937, to file a return of his income for the calendar year 1936. There is set forth what purports to have been his actual income and tax which he should have paid, as well as his reported income and the tax paid. The latter is substantially less than the former. As a means of committing the offense, it is alleged that the return was made under oath March 12, 1937, and filed March 15, 1937. As a further means, it is alleged that Johnson "did conceal and cause to be concealed from any and all proper officers of the United States, his gross and net incomes aforesaid, and the sources of said gross and net incomes and the sources thereof; * * *."

The main contention of Johnson is that inasmuch as no date is alleged as to the time of concealment, a continuing offense is charged. There is some ground for this contention when viewed in connection with a subsequent allegation as to the co-defendants (afterwards discussed). We are of the opinion, however, that this allegation can be reasonably construed as referring to March 15, 1937, the date of the offense as alleged. It is also argued by Johnson that the allegations with reference to the filing of the return and of concealment constitute a violation of Section 145(a) and are, therefore, duplicitous. We do not believe there is any merit in this contention. We see no reason why the matters required or forbidden by that paragraph may not be utilized and alleged as a means of committing the offense defined by Section 145(b).

As to the co-defendants, the count presents a serious and, we think, fatal situation. Following the allegations as to Johnson, to which we have referred, it is alleged that "* * * during the calendar year 1936 and up to and including March 15, 1937, and continuously thereafter up to and including the date of the filing of the indictment * * * (all co-defendants named) did * * * wilfully and knowingly aid, abet, conceal, induce, and procure the said defendant William R. Johnson, * * * to attempt in the manner aforesaid to evade and defeat the income tax aforesaid. * * * *"

Thus the co-defendants are charged with a continuous offense from a period during 1936 up to March 27, 1940, the date of the return of the indictment. While the offense against Johnson and the means employed in connection therewith are charged as of March 15, 1937, the co-defendants as aiders and abettors are charged with an offense which extended over a period of years. This allegation against the co-defendants is so utterly inconsistent with those against Johnson that it, in our opinion, invalidates the indictment as to them. The conclusion seems inescapable that the charge against the aiders and abettors could be no broader than that against the principal. Furthermore, we are of the view that the statutory provision upon which the indictment is predicated does not define a continuing offense, nor does it define an offense which can be committed prior to the date on which the taxpayer is required to file his return. As was said in United States v. Miro, supra, 60 F.2d page 61: "* * * A tax could neither be evaded nor attempted to be evaded if it was not due. * * * *"

And as said by this court in O'Brien v. United States, 7 Cir., 51 F.2d 193, 196: "* * * There could, however, be no such prosecution for a willful attempt to evade or defeat a tax unless there was some tax due from the taxpayer. * * * *"

In addition, as pointed out by the co-defendants, they are charged as accessories both before and after the fact. It is argued that such an allegation is bad for duplicity in view of Section 550, 18 U.S.C.A., by which an accessory before the fact is made a principal and punished as such, while under Section 551, an accessory after the fact can only be punished to the extent of one-half of the maximum imposed upon the principal. The question thus presented has not been decided, so far as we are aware. The Government endeavors to meet the contention by arguing that Section 551 entitled "Punishment of Accessories" is solely for the guidance of the court in pronouncing sentence. It relies upon certain cases,[2] none of which is in point. These cases go no further than

---

[2] Ruthenberg v. United States, 245 U. S. 480, 38 S.Ct. 168, 62 L.Ed. 414; Mullaney v. United States, 9 Cir., 82 F.2d 638; Madigan v. United States, 10 Cir., 23 F.2d 180; Collins v. United States, 8 Cir., 20 F.2d 574.

to hold that by Section 550, the distinction between principals, accessories and accomplices has been abolished and that an accessory or accomplice may be charged and punished as principal. It does not follow, as contended here, that the distinction between an accessory before and after the fact has been abolished, nor does the language of Sections 550 and 551 justify such a construction. The Government's position leads to the result that a defendant may be charged and tried without knowledge as to whether a conviction will subject him to the punishment provided for a principal or the lesser punishment provided for an accessory after the fact. Without information as to whether the jury considered his connection with the offense as having been prior or subsequent thereto, the court, for the purpose of imposing punishment, must determine in which capacity the defendant acted. We are unable to agree with the Government's contention in this respect. We do not believe a defendant can properly be charged in the same count as an accessory, both before and after the fact.

The fifth count charges all defendants with a conspiracy extending from January 1, 1936, to the time of the filing of the indictment, to defraud the United States of income taxes due from Johnson for the years 1936 to 1939, inclusive. The allegations of counts one, two, three and four, so far as they refer to Johnson, are included by reference. The conspiracy alleged was to the effect that Johnson was engaged in the gambling business and that in order to prepare the way for the making by him of false and fraudulent returns, the defendants would conceal from the Revenue Officers the investment, participation and true ownership of Johnson in numerous gambling houses and enterprises in Cook County and Chicago, Illinois, by operating them under names other than his. Twenty-five of such houses were named. It was further a part of the conspiracy to establish and operate currency exchanges where the proceeds from the gambling houses could be converted into currency in such a manner as to conceal the source, ownership and disposition thereof. It was also alleged that the defendants would file and cause to be filed false and fraudulent income tax returns by Johnson. As in the substantive counts there was set forth what purported to be the true income of Johnson for each of the years in question, and also the income as returned for each of those years. Numerous overt acts are alleged.

■ We need not discuss the numerous questions raised by the defendants as to this count. It charges a continuing offense which, in itself, is an answer to most of the criticism as to its validity. Skelly v. United States, 10 Cir., 76 F.2d 483, 488.

■■ We have already held that the fourth count was subject to demurrer as to all defendants. We now hold that the demurrer as to counts one, two and three should have been sustained as to the co-defendants. As to the defendant Johnson, the demurrer was properly overruled as to counts one, two, three and five, and as to the co-defendants properly overruled as to count five.

By motion for directed verdict at appropriate times, the question of the sufficiency of the evidence to sustain the verdict was preserved. It is here argued earnestly and at length that there was no substantial, competent evidence in support of the verdict. In view of the fact that the case must be reversed, we shall attempt to do little more than briefly refer to the theories advanced by the respective parties, and the general character of testimony in support thereof.

Johnson admittedly was a professional gambler and had been for many years. If he had any other business of consequence, the record does not disclose it. He was not just an ordinary gambler, but one of towering stature among that fraternity. The co-defendants were also admittedly in the same business. They operated brazenly and notoriously, and, so far as this record discloses, without interference or restraint during the period covered by the indictment. That the field was a fertile one is evidenced by the huge sums of money which apparently passed through their hands. It is of prime importance, however, to keep in mind that they were not charged with the violation of any law prohibiting gambling, or the operation of gambling houses. Neither were they charged with a failure to file income tax returns at the time required by law. Such returns were filed by Johnson, as well as by the co-defendants, and the Government received income tax for each of the years in question in substantial amounts. For the calendar year 1936, Johnson's return showed a net income of $161,892, upon which he paid a tax of $71,915; for the year 1937, a net income of $248,660, upon

which he paid a tax of $128,399; for 1938, a net income of $101,946, upon which he paid a tax of $34,530, and for 1939, a net income of $251,715, upon which he paid a tax of $130,430. Substantially all the gross income disclosed by these returns was from his gambling operations.

An accountant for the Government computed Johnson's actual income for the year 1936, at $547,942; for the year 1937, $1,047,129; for 1938, $935,353, and for 1939, $961,504.

The Government sought to sustain the charge that Johnson failed to report all of his taxable income for the years 1936 to 1939, inclusive, on two distinct theories:

(a) By undertaking to prove that he owned a group of gambling houses operated in and about Chicago and that all the checks cashed, money deposited and currency exchanged by persons operating these gambling houses were income from these gambling houses, and therefore that the aggregate of these banking transactions was taxable income which was in excess of the amount of net income which he reported; and

(b) By offering proof that he expended in said years more cash than he had available for spending, according to the income reported.

Each of the co-defendants except Brown was the operator of one or more gambling houses named in the indictment. Brown was the manager of the Lawrence Avenue Currency Exchange which handled funds and checks brought to it from various gambling houses. The total amount of money and checks handled by this and other exchanges and banks for the respective years, was, according to the Government's contention, the income of Johnson for such years.

This theory necessarily is predicated upon the premise that Johnson was the sole owner and proprietor and entitled to all the income from such houses. The soundness of the theory must be tested by the premise upon which it is constructed. This basic proposition the Government sought to establish by circumstantial evidence. The circumstances relied upon, in a general way, were proven by witnesses who were patrons, or who were minor employees of the various gambling houses, to the effect that Johnson frequently visited such houses, talked with persons who were in charge, exercised influence in the hiring of some of the employees, exercised certain control over the policies of operation, that the same group of workmen did construction and maintenance work at several of the gambling houses, that certain bus service was provided by the same company to serve the places, that the same accountants served Johnson and the other defendants in the preparation of their income tax returns, that large quantities of $100 bills were taken by the operators of the several gambling houses in cashing checks and exchanging currency, and that Johnson used large quantities of bills of the same denomination in paying the purchase price and for improvements on properties owned by him or in which he was interested. Johnson denied that he owned any of said gambling houses, or that he had any interest in the banking transactions, and offered evidence to show that the gambling houses were owned respectively by certain of those named in the indictment as co-defendants.

We have carefully examined the testimony on this theory of the Government's case and we are of the opinion that, considering it in the light most favorable to the Government, as we must do, the most that can be said is that the proof discloses Johnson had an interest in the gambling houses. The evidence does not show that he was the sole owner and therefore entitled to all the proceeds. The Government's contention on this theory of the case must rest upon the assumption that he owned the entire interest in the houses; that the total of all the business transactions at the currency exchanges and banks represented income from such houses, and that such income was paid to Johnson. It is not claimed that there is any proof that Johnson actually received this income. Such fact, if it be a fact, must be inferred from the other assumptions which we have mentioned. As already stated, Johnson reported a large income from his gambling transactions for each of the years in question, and to say that his interest in the gambling houses was such as to entitle him to an income greater than that reported is to indulge in rank speculation. If Johnson had reported no income for those years, a different situation would have been presented. We have no hesitancy in holding that the verdict can not be supported upon this theory.

On the expenditure theory, however, the case is more favorable to the Government. This theory was sought to

be established by proving a statement purported to have been made by Johnson on January 1, 1932, that he had cash on hand in the amount of $78,000. Thereafter, his income, as disclosed by his returns and his expenses, was shown year by year. The expenses, as shown by the Government from 1932 to 1939, were greatly in excess of his income for the same period. Admittedly, under this theory, the proof failed to establish the charge as to the year 1936. His income as reported for that year, plus what he had on hand at the beginning of the year, exceeded his expenditures by more than $184,000. For the year 1937, however, his expenditures exceeded his income by $106,000; for 1938, by $367,000, and for 1939, by $151,000. True, there is a dispute as to many of the items involved in these calculations, and as to some of them, a serious dispute. We are of the opinion, however, that the proof of his income on this so-called expenditure theory was sufficient to present a jury question. As the proof on this theory, however, does not support the charge as to the year 1936, (count one) Johnson's motion for a directed verdict as to that count should have been allowed. As to the other counts, it was properly denied.

The motion for a directed verdict on behalf of the co-defendants should have been allowed as to counts one, two, three and four. What we have said heretofore concerning the nature of the offense charged is largely determinative. The charge against Johnson was not a continuing one and the offense, if committed, was by the filing of a false return on the 15th day of March of each year. There is no evidence and no contention that the co-defendants had anything to do with the preparation of these returns or that they had any knowledge or information as to their contents. Acts performed and statements made by them before the commission of the offense by Johnson are not sufficient to justify their conviction as aiders and abettors. We need not stop to inquire what distinction there is, if any, between aiders and abettors and a conspirator, for the reason that the case was presented on the theory that there was a distinction. It was so recognized in the indictment and throughout the trial. The evidence which the Government relies upon indiscriminately to establish the charge in the substantive counts, and the conspiracy count, however, was sufficient to require submission to the jury upon the latter charge. As to this count, therefore, the motion for a directed verdict was properly denied as to all defendants.

The defendants severely criticize a large amount of evidence admitted against them. After a study of the record in this respect, we are not convinced that any of it, with the exception later referred to, is such as to require a reversal. In a case of this character, much must be left to the discretion of the trial court. A large part of the evidence complained of was proper as to the conspiracy count, but improper as to the substantive counts. The fact that it is not relevant as to the latter does not require its exclusion as to the former. Typical of such evidence was the income tax returns filed by the co-defendants for the years covered by the indictment. They were properly admissible, we think, under the conspiracy count but should have been limited thereto. We are unable to see how they were material against any of the defendants as to the other counts. On the other hand it is difficult to see how their admission was harmful. In fact, it is our view that if they had any effect, they were beneficial to the defendants rather than harmful. These returns disclose a substantial income on the part of the co-defendants who, according to the Government's theory, were mere employees of Johnson in the operation of various gambling houses. The amount of income reported indicates that such co-defendants had an interest in such houses rather than that they were mere employees of Johnson as contended. It would therefore seem that they had no prejudicial effect.

Another line of testimony, properly subject to criticism in our opinion, was that given by scores of witnesses as to every conceivable detail concerning the operation of gambling houses. Some of this was relevant to the contention that Johnson was the owner and operator of the houses. On the other hand much of it was wholly irrelevant to any issue in the case. A glaring example of such testimony was given by the witness Spankeren. He testified as having gambled at some of the houses mentioned in the indictment. After losing $16,000, he quit gambling. A law suit was filed by his mother-in-law against a number of persons, including the defendant Johnson and co-defendants Sommers and Hartigan, apparently under a

**126**

Statute authorizing recovery of losses sustained at gambling. The suit was settled with a lawyer representing Sommers for $1,000, and the promise of a political appointment. It appears to be the Government's theory that this evidence proves ownership by Johnson. There is nothing to connect him with the incident, however, except the fact that he was named as a defendant in the suit. There is nothing to indicate that he had anything to do with settling the law suit or that he paid or promised anything for a settlement. This testimony did not prove, or tend to prove, ownership. The most that can be said is that it tended to show that the mother-in-law must have thought Johnson had an interest in the gambling house as he was made a defendant. By the same token, however, she must have thought that all the other defendants likewise had such an interest. Some of the testimony complained of pertained to gambling houses with which the defendants were not shown or claimed to have had the slightest connection. A great amount of time was consumed in proving that gambling houses operated upon a large scale. This was irrelevant to any issue in the case, especially in view of the fact that the Government did not rely upon losses sustained by individual patrons in determining Johnson's income. There was no issue in the case as to the occupation of Johnson or the co-defendants. By Johnson's tax returns, he had disclosed an enormous income from gambling operations, and the returns of the co-defendants disclosed substantial incomes. The offense charged was evasion of income tax—not gambling or operating gambling houses. A person reading the record, without knowledge of the charge, could reasonably conclude that the defendants were tried on the latter offense. There is room for argument that the admission of such testimony in wholesale quantities was prejudicial. To what extent this may be true, we need not decide. It must be remembered that the defendants were admitted gamblers engaged in the operation of gambling houses on a large scale. It would seem they are not in a very good position to complain of that part of the testimony which merely disclosed the magnitude of their operations.

We shall now refer to the testimony given by one Frank J. Clifford who testified for the Government, purportedly as an expert witness. It is contended by the defendants that his testimony invaded the province of the jury. On the other hand the Government contends that he testified in response to proper hypothetical questions. He qualified as an expert accountant and that he had been in the employ of the Government as a Revenue Agent for five years. So far as material to the question now under consideration, he first testified that the amount of currency delivered to the Lawrence Avenue Currency Exchange between the months of July, 1938, and September, 1939, was $1,289,000. So far as is shown by the bill of exceptions contained in the record, he then, of his own volition, stated: "I have made an analysis and computation based on Governments exhibits (naming over 400 exhibits) and other evidence in the record to determine the amount of net cash income reported by the defendant William R. Johnson for the years 1932 to 1939, inclusive."

He was asked to state the amount, and after doing so, volunteered the statement that he had made a computation of Johnson's expenditures for the years 1932 to 1939, inclusive. In response to a question he gave the result of such computation and again volunteered that he had made a computation as to the excess of expenditures over net cash income for the same period of time. In response to a question, he gave the result of such computation. He then volunteered the statement: "With the exhibits just a moment ago enumerated, and the other evidence in the record, I have made a computation to determine the total amount of gross income of the defendant Johnson for the calendar year 1936."

The examination of this witness (omitting the numerous objections by defendant's counsel) proceeded as follows:

"Q. What is the amount, from your computation, of the gross income of the defendant Johnson for the calendar year 1936, according to your computation?

"The Court: You are making reference to those exhibits and the evidence in the record?

"Mr. Hurley: He used those as a basis for his computation.

"The Court: Overruled.

"The Witness: $547,942.38.

"I am able to state the amount of tax still due by the defendant Johnson to the United States for the calendar year 1936, after allowing credit for the amount of tax shown on defendant's tax return for the year as shown by Government's Exhibit R-10, in evidence.

"Q. And what is the total amount of tax still due the United States, according to your computation, for the year 1936?

"The Witness: $268,041.09."

Without a question the witness stated "I have made a computation based on the list of exhibits which you have read to me and the other evidence in the case to determine the total amount of Johnson's net income for the calendar year 1937.

"Q. What is that amount?

"The Witness: $1,047,129.77."

Again, without being questioned, he stated:

"I am able to state the amount of tax still due by Johnson for the calendar year 1937, after allowing credit for the amount of tax shown on Johnson's return for that year.

"Q. And what is the total amount of tax still due to the United States, according to your computation for the calendar year 1937?

"The Witness: $588,064.20."

The same character of question was propounded and the same character of response made as to Johnson's net income and tax due the Government for the years 1938 and 1939. It will be noted that the witness was not asked to assume anything. It is not necessary to refer to his cross-examination in determining the propriety of his examination in chief. It plainly discloses, however, that he decided in favor of the Government all the controverted issues upon which his answers were predicated.

Proper and specific objections were interposed by the defendants and overruled. The mere recitation of the questions propounded and answers given by this witness demonstrates their gross impropriety.[3] He was permitted to examine hundreds of exhibits, consider "all the evidence in the case" and testify as to each of the years in question the amount of Johnson's net income and tax due thereon. In arriving at his factual conclusions, he necessarily was required to weigh the testimony on many conflicting points and to decide all controversies in favor of the Government. After this testimony the jurors were no longer required to think. The vital issues concerning which they had heard testimony for weeks had been determined and decided.

In support of its argument that Clifford's testimony was proper, the Government cites and relies upon a number of cases in which hypothetical questions have been approved.[4] There is little dispute among the authorities as to when and in what form a hypothetical question is proper. As was said by this court in the Guzik case, supra, 54 F.2d page 620: "* * * Certainly a hypothetical question may be deemed safe from ultimate attack where there is evidence tending to prove all the facts assumed and it includes all the material facts which the evidence tends to prove and which bear upon the subject with regard to which the expert is asked to express an opinion."

The reason an answer to such a question does not invade the province of the jury is aptly stated in Travelers Ins. Co. v. Drake, supra, 89 F.2d page 50: "* * * The truth of facts assumed by the hypothetical question as within the probable range of the evidence, as a basis to support the hypothetical question, is a question of fact for the determination of the jury to find with the other submitted facts upon a fair submission of the issue, and it must determine whether the basis upon which the hypothetical question rests has been established. * * *"

None of the cases relied upon by the Government has any application to the instant situation for the reason that by no stretch of the imagination can the questions be treated as hypothetical. Not a single question by which the objectionable answers were elicited contains any assumption or hypothesis. In fact, some of his testimony was voluntarily given. It follows that the jury was not permitted to pass upon the validity or soundness of the premise upon which the answers were based. Thus the essential element of a hypothetical question, by which it is saved from invading the province of the jury, was eliminated. In oral argument before this court, counsel for the Government, in effect, conceded that after the testimony of this wit-

---

[3] United States v. Spaulding, 293 U.S. 498, 506, 55 S.Ct. 273, 79 L.Ed. 617; Dexter v. Hall, 15 Wall. 9, 82 U.S. 9, 26, 21 L.Ed. 73; Wilkes v. United States, 9 Cir., 80 F.2d 285, 291; United States v. Stephens, 9 Cir., 73 F.2d 695, 704.

[4] Travelers Ins. Co. v. Drake, 9 Cir., 89 F.2d 47, 50; Gleckman v. United States, 8 Cir., 80 F.2d 394; Guzik v. United States, 7 Cir., 54 F.2d 618, 620; City of Port Washington v. Thacher, 7 Cir., 245 F. 94, 96.

ness there was nothing left for the jury to decide except the truthfulness of his testimony.

The Government contends that the cases cited by the defendants are inapplicable for the reason that "none of them involves the type of case which we are concerned with, namely an income tax prosecution." We are unaware, however, of any reason or authority by which a different rule should be applied because of the character of the case. That a proper hypothetical question could have been framed and propounded, we do not doubt. That such was not the case is so plainly and conclusively demonstrated as to admit of no dispute. We are of the view that the testimony of this witness, going to the very heart of the controverted issue and invading the province of the jury as it did, was so prejudicial and damaging that it alone would require a reversal of the judgment.

It would serve no good purpose to further extend this opinion by a discussion of the many other errors assigned. We have endeavored to limit our discussion to the more important ones,—those relating to substance which can not be aided by verdict, and which affect the substantial rights of the defendants. In our study of the record and in preparing the opinion, we have endeavored to keep in mind a basic concept of American jurisprudence which, from time immemorial, has taught that every person charged with crime, regardless of his occupation or station in life, is entitled to a fair and impartial trial upon the issue or issues tendered by a legal indictment, returned by a Grand Jury empowered to act.

In view of what we have said, it necessarily follows that the judgment must be reversed. It is so ordered.

EVANS, Circuit Judge (dissenting).

The assignments of error may be divided into two groups: (a) those that deal with the indictment; (b) and errors allegedly committed in the course of the trial.

Group (a) must likewise be divided into: (1) attacks on the grand jury and its authority to return the indictment here involved, and (2) assaults on the various counts of the indictment due to their alleged duplicity and inconsistency.

Convinced that the grand jury was within its authority in returning this indictment, I am compelled to dissent. This assignment raises a most important question. The holding of the majority opinion will greatly handicap the prosecution of offenders, who have concealed the facts establishing their crimes, so successfully, that a prolonged investigation into their activities is necessary. Moreover, I feel so certain that none of the counts of the indictment is demurrable because of inconsistency or duplicity, that dissent here, too, is necessary.

The assignments of error which challenge the sufficiency of the evidence to sustain the conviction of the first four counts set forth in the indictment have raised doubts which have made me pause, but here, too, I am persuaded that the evidence presented a jury question.

Other questions I shall discuss at such length as their importance, in my opinion, deserves.

(1) Defendants contend that the grand jury returned the indictments upon *investigations* begun during *extensions* of its term, rather than during its initial term. This, it is asserted, was contrary to the statute, 28 U.S.C.A. § 421, which reads:

"* * * A district judge may, upon request of the district attorney or of the grand jury or on his own motion, by order authorize any grand jury to continue to sit during the term succeeding the term at which such request is made, solely to finish investigations begun but not finished· by such grand jury, but no·grand jury shall be permitted to sit in all during more than eighteen months: * * *."

My reasons for rejecting defendants' urge in this regard are:—

(a) It is *not shown* that the indictment was a result of subsequent investigations, *i.e.*, investigations begun at the February or March Terms, rather than at the December Term.

(b) The indictment itself states that the investigations were in fact begun at the December Term.

(c) The crimes charged, all flowed from the same comprehensive and integral plan, so that in fact there could be but *one* investigation, although, because of statutory provisions, each year's attempt is made an "annual" crime as to each participant.

(d) The investigation as to the tax year 1939, which the proof pointed to, as necessarily showing a beginning of the investigation at the March, 1940 Term (because the crime was not committed un-

til March 15, 1940) may well have been anticipated and investigation of its probable future commission begun at the grand jury's initial term in December, 1939. In fact, a study of this year may well have been deemed necessary to confirm the facts, *and the proper deductions from such facts,* developed in the investigation of previous activities. It would have been negligent for them not to have continued their investigation of the criminal plan to the date of the hearing, when their investigation pointed strongly to the existence of a criminal enterprise in the years 1936, 1937 and 1938.

(e) In construing the statute, we must give a fair and rational construction to the word "investigation" otherwise a conclusion, unreasonable in its results will be reached.

To better understand the situation, I restate briefly the facts which this contention concerns:

December, 1939 The grand jury was impaneled.
January 24, 1940 The first order extending the term of the grand jury.
Feb. 28, 1940 The second order extending the term of the grand jury.
March 1, 1940 The indictment No. 32127 against Johnson for same transactions as in counts 1, 2, and 3, of instant indictment, was returned (February Term.)
March 15, 1940 Commission of last substantive offense charged, *i. e.*, in regard to 1939 tax.
March 29, 1940 The instant indictment returned, during March Term.

The first order of extension, made January 24, 1940, authorized the grand jury to sit during the February, 1940 term of court to *finish* investigations begun but not finished at the December, 1939 Term. *We should presume they did what they were ordered to do.*

The second order of extension of the term of the grand jury (which order is the basis of defendants' attack) was on the petition of the grand jury therefor:

"Now comes the * * December Grand Jury * * and * * requests that an order be entered authorizing them * * (the said Grand Jury) heretofore authorized to sit during the February 1940 Term * * to continue to sit during the * * March 1940 Term * * to finish investigations *begun but not finished* * * during the said December 1939 *and the said February 1940 Terms* * *.

"It is Therefore Ordered That the * * December Grand Jury * * be * * authorized to continue to sit during the March 1940 Term of Court for the purpose of finishing *said* investigations."

The defendants argue that since the indictment was returned during the third term and covered: (a) crimes [1] which had been the subject matter of an indictment returned during the second term, and as to which presumably investigations had been finished in said second term, a *new* investigation of such crimes, must therefore have been begun in the third term; (b) crimes [2] not theretofore covered in the first indictment, and one of them in fact not committed until the third term—*a fortiori,* investigation as to these crimes could not have been begun in the first—December—Term and therefore any indictment charging such crimes is void because predicated on an investigation which the grand jury had no right to make, having been initiated during extensions of its original term.

This contention, though somewhat plausible, is quite fallacious.

(1) The indictment's preamble alleges

"The Grand Jurors * * at the December Term * * having begun but not finished during said December Term of Court among other things an investigation of the matters charged in this indictment, *and having continued to sit by order of this court * * for the purpose of finishing investigations begun but not finished during said December Term of Court * *.*"

This was the same grand jury which presented the petition containing the words, allegedly ambiguous, upon which the order here assailed, is based. Should not their formal statement, made at the culmination of their deliberations be considered as proof positive of the facts they recite? Must not the formal statement of the grand jury as to their own acts, done in the secrecy of the grand jury room, be accepted? As against such positive statement, defendants without knowledge, make statements in the nature of conclusions, without explanatory basis or sources of information given—when it is apparent they make such statements merely on their own deductions from the fact that the fourth count of the indict-

[1] Attempt to evade 1936, 1937, and 1938 taxes.

[2] Attempt to evade 1939 taxes, and conspiracy count.

ment dealt with a fact which occurred after the December Term had expired.

The recital of this *fact* in the indictment can not be challenged by a demurrer, plea in abatement, or motion to quash, all of which challenge issues of law (Longsdorf, Cyclopedia of Federal Procedure, Secs. 2122, 2136, 2145.)

(2) The first order of extension, made January 24, 1940, authorized the grand jury to sit during the February, 1940, term of court to finish investigations *begun but not finished* at the December, 1939 term. Must we not presume the grand jury acted as it was legally directed to act, during the February term, *i.e, finish* investigations *begun* at December Term? If such be the fact, the *second* extension only gave them permission to continue investigations begun at the December Term, because they had had no authority to begin any other investigation during the February Term.

(3) The crimes, which the grand jury was investigating, were in reality the fruition of a *single scheme,* the results of which were multiple crimes arising not by virtue of the fact that distinct, separate, transactions and schemes were involved, but because the income tax statute makes possible a recurring crime for each annual period of its existence. As was said in the case of United States v. Sullivan, 2 Cir., 98 F.2d 79, 80,

"Indeed, the crimes charged in the indictment describe one course of conduct extending over several years, which results in separate offenses simply because the duty to file a return and pay the tax is one that recurs every twelve months."

The scheme (assuming here its existence) was of a single, comprehensive plan wherein A, B, C, D, and E, claimed ownership of the respective gambling houses in order to relieve F, the real owner, of a liability for larger surtaxes. The scheme was a single one. It was to run for an indefinite period. In the course of its life various crimes were committed, some against state laws, some against Federal laws. The grand jury was put on the trail at its December Term. Due to the successful covering of all tracks, time and effort were required by the grand jury to ascertain whether the defendants' action was merely to avoid state law prosecutions or whether said defendants had committed violations of Federal criminal laws and were seeking to conceal their violations.

The grand jury was unable to complete its investigation in one month. It sought, and secured, an extension of time. Still it was unable to complete its investigation. It again sought and secured an extension of time. Undoubtedly, information was obtained during the first extension that had not been uncovered during the December Term. But it was the same criminal scheme, the investigation of which was begun in the December Term. The grand jury could validly continue to *investigate* the facts originally found at the December Term, supplemented by what it found during the first continuance, for it was the same illegal scheme which was being investigated.

Assume now, as defendants contend, that the grand jury *began* its investigation of later aspects of this same illegal scheme during the February or March terms. In fairness to them, must we not accept their statement that they were merely *continuing* investigations begun at December Term? There is nothing to indicate these defendants formally terminated their relationships and started new ones each year, thereby making a new, an annual conspiracy. No, the defendants A, B, C, D, and E, having long ago conceived the plan of deceptive ownership of the various houses, merely maintained the same relationship through the years involved. The most that can be said is that the evidence which the grand jury may have considered at its later sessions manifested the continued life of the identical, integral, continuing scheme to defeat the income tax law by numerous deceptive acts. They may have come to the grand jury's attention later, but they were a part of the same investigation begun at the December Term.

The majority opinion places much weight on the fact allegations in the motion to quash—on the ground that such facts are admitted by the Government's motion to strike—which facts stated that as to the first three counts the investigation was necessarily completed on the return of the first indictment in February Term and such investigations being finished, they could not be again renewed (begun) during an extension of the same grand jury term because such extensions are made solely to cover investigations begun *but not finished* during the initial term. The motion to quash also states as a fact that as to the fourth count (1939 taxes) no investigation was begun until the March Term.

In passing it should be said that the allegation of such facts, wholly hearsay and unsupported by proof, and set forth in the nature of a conclusion, are properly challenged by a motion to strike.

As to the first three counts—of what materiality is the fact that the same crimes were covered by an indictment during the first extension of the term? Nothing could be better evidence of the fact that the investigation relative thereto was "not finished" during that extension than the fact that the grand jury found it necessary to present a second indictment to cover the *same* offenses. (The majority opinion concedes the right to continue investigations, even after the return of a first indictment. What is there then to prevent the indictment, on this issue, being valid as to the first three counts, and therefore valid support of the judgment?)

We ought not ignore the well-established rule that rulings on motions to quash and plea in abatement to indictments are not reviewable here, for "unless (there is) such a failure to properly exercise judicial discretion as to cause real injustice * * * defendant can not complain where no prejudice has resulted. * * * * "[3]

The majority opinion states, "We are unable to discern how an illegal order of continuance can be cured or even aided by an allegation in the indictment to the effect that the Grand Jury was legally continued." Admitting that an illegal order of continuance is void, my position is that the instant order is neither illegal nor void when construed in the light of the facts shown by the indictment and the continuing nature of the crime under investigation. The indictment does not recite that the grand jury was "legally continued." It recites *facts* from which that deduction is inescapable.

The indictment states all the investigations were begun at the December Term. The first order directed them to continue only investigations begun at the first term. The second order permits them to "continue to sit for the purpose of finishing said investigations." The petition upon which the second order was based recited the grand jury had been theretofore authorized to sit during the February Term (note, it was only to finish investigations begun in December) and asked to be authorized "to continue to sit to *finish* investigations begun but not finished by * * (them) during the said December, 1939 and the said February, 1940 terms."

Why can not the time phrase "during the said December and the said February terms" be construed to modify merely the verb "finished" and not the *preceding* verb, "begun"—and the verb "begun" be read in the light of the first order of continuance, to mean "theretofore begun" in the December Term? I can reach no other conclusion than that a fair reading of the two petitions for extension of time and the language of the indictment wherein the grand jurors stated that they continued "to sit for the purpose of finishing investigations *begun but not finished* during said December Term of Court," is sufficient to close the door to further discussion.

But another reason for this conclusion is to be found in the word "investigation" as used in this statute. "Investigation" is a noun which defines action. Alone, it is indefinite and well-nigh meaningless. The grand jury began its investigation when sworn in. Charge of Justice Field to Grand Jury, Fed. Cas. No. 18,250. Note to 22 A.L.R. p. 1356. Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979. Investigation of what? Of crimes which were committed in the District? If this be its meaning then the field of investigation after the continuance, was limitless. This all-inclusive meaning must be rejected, I think, if for no other reason than that it renders meaningless the sentence wherein the word appears. The word "investigation" must have a more restricted connotation. A more limited and rational meaning of this word may be had if we bear in mind what the grand jury is organized for, and to emphasize the fact that it is to investigate facts. Being laymen (usually), they are hardly qualified to investigate legal questions such as are raised by counsel for accused after the indictment is returned. The grand jury investigates the facts brought to its attention, which facts establish or point to the commission of a crime.

To illustrate,—Before the grand jury, appears a witness, and tells of D's making and selling large quantities of liquor. Other witnesses confirm the story. The search is continued. The trail becomes hot. Defendant is not the only one involved. It appears the territory covered by the operations is extensive and the business, large.

3 Longsdorf, Cyclopedia of Federal Procedure, Sec. 2132, 2135.

The participants are numerous. Also, it appears that a master mind behind the scenes directs the operation of all. He divides the spoils, retaining a goodly portion for himself.

The grand jury is unable to complete its study within the month and asks for, and secures, an extension of time in which to "investigate". To what must its investigation be confined during the continuance?

Let us go further with our imaginary case. During the second month's investigation the proof becomes more definite and clear as to individuals, as to crimes committed, and also of a conspiracy to commit them, as well as the names of the parties thereto. In justice, however, to the individuals, possibly innocent, whose names have been on the tongues of several witnesses, more time is needed and a second order of continuance is sought and obtained.

Finally, the indictments are about to be drawn. Unexpectedly, a witness appears who gives testimony which, in view of the previous stories, is entitled to great weight. He admits his own participation in the enterprise. He is an actor who played a leading role in the tragedy. He is an accomplice, and his motive is to obtain immunity. However, he adds a new phase to the case. He tells the story of the inside working of the crimes. The long-continued success of the enterprise is due to the fact that the master mind has repeatedly bribed a revenue agent and thereby avoided prosecution.

Was the new crime, to-wit, bribery of the Government officer a part of the original investigation? Who is to determine when the grand jury investigation began, which disclosed not only the commission of substantive crime, but of conspiracy? If there were separate investigations, when did one end? The other begin?

Under the holding of the majority opinion the grand jury could not indict except for the substantive *crimes* which had been proven in the first month's investigation. Moreover, the court (and perhaps a petit jury) was required to first try and determine when the investigation of count one began—and also of counts 2, 3, 4, and 5. The statement of the grand jury in its indictment is of no avail.

The more logical construction of the word "investigation", as here used, it seems to me, can be had by limiting it to those matters which engaged the attention of the grand jury during the December Term, but not restricting it to crimes which had been *established* during that first month's inquiry. If the facts established by the testimony brought out on the second or third continuance of the grand jury disclose a crime or crimes, *and such facts are associated with the subject-matter of the investigation of the first term,* the grand jury may validly indict therefor.

The rights of defendants charged with crime should always be diligently protected. Courts and grand juries, statutory creatures that they are, should never exceed their statutory powers. But, just as important, is the binding force of a conviction of one accused of crime, whose long and carefully contested trial has resulted in a verdict of guilt. We must not be deceived by astute presentation of a hypercritical contention which delves into the niceties of every possible technical defect, be it, as here, the ambiguity of the second order continuing the grand jury term, or the question of duplicity, discussed immediately following. Pleadings and orders in criminal cases should be read and construed rationally and reasonably and fairly. Grand juries and indictments are to prevent false and malicious charges and to inform defendants of the charges upon which they must stand trial. That is their sole purpose.

2. *Duplicity.* Was there duplicity? Was there a charge that the co-defendants were accessories after the fact?

The specific wording of the counts challenged negatives any intent to charge a crime other than aiding and abetting the crime of attempting to evade the income tax for each year. The language is clear and only hypercritical deductions can support a contention that the crime of accessory after the fact was also meant to be charged. As was said by this court in Meyer v. United States, 7 Cir., 258 F. 212, 214,

"Another contention is that the indictment does not show that the overt act was done to effect the object of the conspiracy. Invoking the rule that inferences are to be taken against the pleader, plaintiffs in error insist that we shall infer that they lawfully turned over the * * * check * * *. But the rule does not extend to imagining inferences that are contrary to the fair common-sense reading of the averments."

Obviously, the attempt to evade a tax is a continuing crime, running to the date of the Government's discovery and indict-

ment therefor. It may, of course, encompass several distinct offenses in the course of its duration. The attempt is effectuated in part by the filing of the return on March 15, partly by concealing of records, failure to keep books, continued holding by others of income-yielding businesses of taxpayer, etc. The crime of attempt is not necessarily ended with the filing of the return, if the attempt in fact continues thereafter. Neither is the crime of aiding the attempt, there ended. The attempt to evade may be, and often is, finally terminated on its discovery by the Government. This reasoning does not, however, preclude the indictment of the taxpayer for some isolated act effecting the attempt, such as the filing of a false return on a particular day.

Counsel stress the fact that co-defendants are charged with aiding not only before March 15, of each year, but continuously thereafter, to the date of the indictment. Aside from the suggestion just made, that the crime of aiding the attempt actually continued for such period, it may be pointed out that Johnson, the principal, was charged not only with filing a false return on the particular date specified, March 15, but—

*without specifying the time*—charged that he concealed from the Government officers his income and all books and records reflecting such income.

A plain reading of the counts discloses the charge of but *one* offense, *i. e.*, aiding and abetting the offense.

But, conceding there was a multiplicity of offenses charged, was it a prejudicial or reversible error? Not if the inescapable trend of precedents upholding indictments against attack on the ground of duplicity where no prejudice is shown, be followed.[4]

*Language of Indictment Indicative of Charge of Single Crime, in each Count.* A study of the indictment plainly reveals Johnson (in count one) is charged simply with an attempt to defeat and evade income taxes in that he "did wilfully and knowingly attempt to defeat and evade a large part * * of a tax upon his net income for the calendar year 1936 * * which said wilful attempt * * was by means and in the manner following (here follow numerous recited acts, in themselves offenses, which Johnson claims rendered the indictment duplicitous as to him) * *." As to co-defendants, it is specifically charged that

---

[4] Jelke v. United States, 7 Cir., 255 F. 264, 274:

"Decisions that reject technical objections to criminal indictments are not now the exception, and an overwhelming array of authorities may be found that call for liberal construction of criminal pleadings [Citing many cases.] * * *

"While perhaps instructive, we are convinced that many of the criticisms made are hypercritical and evidence scholastic ingenuity, but if adopted in this case, or ·applied to the average indictment, 'would rightly bring odium upon the administration of justice in the minds of all sensible people, whether learned in the law or not.' "

In Hewitt v. United States, 110 F.2d 1, 5, the Eighth Circuit said (quoting the Supreme Court in part Hagner v. U. S., 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861):

" 'The rigor of old common-law rules of criminal pleading has yielded, in modern practice, to the general principle that formal defects, not prejudicial, will be disregarded. The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceed-

ings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." * * *

" 'This section was enacted to the end that, while the accused must be afforded full protection, the guilty shall not escape through mere imperfections of pleading.' * * *

"The sufficiency of an indictment should be judged by practical, and not by technical, considerations. It is nothing but the formal charge upon which an accused is brought to trial. An indictment which fairly informs the accused of the charge which he is required to meet and which is sufficiently specific to avoid the danger of his again being prosecuted for the same offense should be held good."

The Fifth Circuit said, in Hartwell v. United States, 107 F.2d 359, 362,

"While it is certainly true that a valid indictment cannot be dispensed with as a predicate to conviction where an indictment is necessary * * * it is also true that the practice of fine combing indictments for verbal and technical omissions is no longer countenanced in the courts, and that a substantial compliance with the purpose of an indictment to acquaint the defendant with the offense of which he stands charged, so that he can prepare his defense and protect himself against double jeopardy, is sufficient."

"during the calendar year 1936 and up to and including March 15, 1937, and continuously thereafter up to and including the date of filing this indictment * * (naming co-defendants) did unlawfully, feloniously, wilfully and knowingly aid, abet, conceal, induce and procure the said defendant Johnson * * to attempt in the manner aforesaid to evade and defeat the income tax aforesaid * * by the means and in the manner aforesaid * * 26 U.S.C.A. Int.Rev.Code § 145."

The co-defendants are charged merely with aiding in such attempt. They are not charged with being accessories after the fact as they allege, but merely with continuously aiding the attempt. The words "feloniously aid in the attempt in the manner aforesaid" conclusively show the pleader had but one crime in mind, and that was not the misdemeanor of an accessory after the fact.

Moreover, duplicity does not arise from the fact that the allegations would support the charging of two crimes, *if in fact only one be charged or adequately stated.*[5] I think that is the instant situation.

*Where Several Crimes Recited Are Incidents of One Transaction There Is No Duplicity.* Duplicity does not arise where the offenses charged are merely varying aspects or incidents of the same transac-

---

[5] In Howell v. United States, 296 F. 911, 912, the Fifth Circuit said:

"It thus appears that it is an offense for a dealer to fail to register and to pay the special tax, and that it is another and separate offense for any person to purchase or sell derivatives of opium or cocoa leaves, such as * * *, except in or from the packages to which the tax-paid stamps are attached.

"Each of the offenses above named should be charged in separate counts of an indictment, because they are separate. That part of the indictment which charges that the defendant as a dealer was required to register, and that he unlawfully dealt in the prohibited drugs, *does not charge that he failed to register. The indictment, therefore, does not charge one of the two offenses, and it follows that the language just referred to is surplusage.* But the indictment does charge that the defendant was a dealer, and dealt in and had in his possession narcotics to which the stamps evidencing the payment of the internal revenue tax were not attached. It therefore sufficiently charges the second of the offenses above mentioned. The form of the indictment is imperfect, but in our opinion it is sufficient to uphold a conviction of the defendant as a dealer, for the reason that the attempt to charge the failure to register was not successful."

In Ray v. Commonwealth of Kentucky, 230 Ky. 656, 20 S.W.2d 484, 486, 66 A. L.R. 1297, the Kentucky Court of Appeals said,

"The effort to charge appellant as an aider and abettor, after charging him and Gagnon as principals, and without setting out the charge of aiding and abetting in a separate count, does not render the indictment as a whole defective [the indictment was in one paragraph]. * * * In Watkins v. Com., 227 Ky. 100, 12 S.W.2d 329, an indictment for murder, charging two defendants as principals and as aiders and abettors in a single count, was held sufficient."

27 American Jurisprudence, Indictments and Informations, § 126, page 686:

"Although at common law different grades of the same offense cannot be included in the same count, it is now the generally approved practice to allow the different grades of the same offense to be thus joined, as also an offense or offenses included in the principal crime charged, although it is the more usual practice to set up the several grades or degrees in different counts. An indictment against two persons which charges both as principals and later in the same count charges the accused alone with aiding and abetting in the commission of the offense, is not defective for not stating the latter charge in a separate count."

In Kitrell v. United States, 10 Cir., 76 F.2d 333, 334, the court said:

"It is said that each [count] is bad for duplicity in that each charges an attempt to defeat and evade the tax and a failure to make a return, and that the only method of tax evasion charged is the failure to make return. But the third count does not charge * * * Nor can it be maintained that either of the counts is duplicitous. The questions thus raised seem to now be authoritatively settled against appellant's contention."

The Court, in Connors v. United States, 158 U.S. 408, 410, 15 S.Ct. 951, 952, 39 L.Ed. 1033, said:

"The first assignment of error questions the sufficiency of the indictment in that it charges the accused, as he insists, with three distinct offenses in one count, namely: With having unlawfully and with force and arms seized, carried away, and secreted the ballot box; * * * with having *aided and assisted* in the forcible and unlawful seizure,

tion.[6] The principal offense here charged was the attempt to evade income taxes. The co-defendants' offense was aiding that attempt. They gave such aid before the filing of the return by filing separate returns which misled the Government as to the true ownership of the houses, and, after the return, by concealing, failing to keep, or destroying, records, and by continuing the deceptive ownership of the various houses. All the acts were simply means of effecting their crime *of aiding* the attempt —that was all that was charged by the indictment or punished by the sentence. I have very serious doubt that an aider of the crime, who is punished as a principal, could also be punished as an accessory after the fact, even if it were so charged. When he becomes a principal, the other offense becomes merged. Otherwise, an aider before the fact and after the fact could be more seriously punished than the principal, which was hardly within the contemplation or purpose of the Act.

*Allegation of Dates May Be Treated as Surplusage.* The indictment which gives rise to the alleged duplicity concerns the dates, or period, covered in connection with the said complicity of the co-defendants. Such dates or allegation of period may be treated as surplusage. The date is not a material element of the offense charged— and the period beyond the March 15, if that be taken as the crucial date, may be

---

\* \* \* and with having *counselled, advised, and procured the seizure.* \* \* \*

"This objection to the indictment is not well taken. The offense charged was that of unlawful interfering with the officers of the election in the discharge of their duties. \* \* \* The verdict of guilt had reference to that crime, whether committed in one or the other of the modes specified in the indictment. Undoubtedly, it was in the discretion of the court to compel the prosecutor to state whether he would proceed against the accused for having himself seized, carried away, and secreted the ballot box, or for having assisted or procured others to do so. But there was no motion \* \* \* to make such a statement \* \* \* nor, if made by demurrer or by motion, and overruled, would it avail on error unless it appeared that the substantial rights of the accused were prejudiced by the refusal of the court to require a more restricted or specific statement of the particular mode in which the offense charged was committed. \* \* \* There is no ground whatever to suppose that the accused was taken by surprise in the progress of the trial, or that he was in doubt as to what was the precise offense with which he was charged. \* \* \*"

[6] Crain v. United States, 162 U.S. 625, 636, 16 S.Ct. 952, 955, 40 L.Ed. 1097. The Supreme Court said:

"We are of opinion that the objection to the second count upon the ground of duplicity was properly overruled. The evil that congress intended to reach was the obtaining of money from the United States by means of fraudulent deeds, powers of attorneys, orders, certificates [etc.] \* \* \* The statute was directed against certain defined modes for accomplishing a general object, and declared that the doing of either one of several specific things, each having reference to that object, should be punished by imprisonment. \* \* \* We perceive no sound reason why the doing of the prohibited thing in each and all of the prohibited modes may not be charged in one count, so that there may be a verdict of guilty upon proof that the accused had done any one of the things constituting a substantive crime under the statute. And this is a view altogether favorable to an accused who pleads not guilty to the charge contained in a single count, for a judgment on a general verdict of guilty upon that count will be a bar to any further prosecution in respect of any of the matters embraced by it."

In Skelly v. United States, 76 F.2d 483, 487, the Tenth Circuit held

"The acts of a principal to a substantive offense and the acts of an accessory after the fact thereto, are one continuous criminal transaction. At common law the principal and accessory after the fact may be jointly indicted and where so indicted they should be charged in one count \* \* \*. Therefore the acts of the two constitute a single offense committed by them jointly, one acting as principal and the other as accessory after the fact."

United States v. Leche, D.C., 34 F. Supp. 982, affirmed, 5 Cir., 118 F.2d 246; Silkworth v. United States, 2 Cir., 10 F.2d 711; United States v. Fero, D.C., 18 F. 901; Rowan v. United States, 5 Cir., 281 F. 137; Egan v. United States, 52 App.D.C. 384, 287 F. 958; Greenbaum v. United States, 9 Cir., 80 F.2d 113; Kurczak v. United States, 6 Cir., 14 F.2d 109; United States v. Otto, 2 Cir., 54 F.2d 277; Jacobsen v. United States, 7 Cir., 272 F. 399; Connors v. United States, 158 U.S. 408, 15 S.Ct. 951, 39 L.Ed. 1033.

considered as surplus allegation [7] or be corrected by the facts proved.[8]

Duplicity may be error of form, which under 18 U.S.C.A. § 556, does not render the indictment bad.[9]

Looking at this matter of the allegation of the continued aid of the principal's attempt to evade each year's tax, from an ordinary, common sense viewpoint, we have simply a case of A, B, C, D aiding E to evade 1936 tax by X means, and aiding the attempt to evade the 1937, 1938, and 1939 taxes by the same X means—they have really but used the X means continuously to assist the effectuation of the annually recurring attempt, and, since the assistance covered at least four years, and appertained to all years' taxes, this assistance is, unfortunately for the co-defendants, made four offenses by virtue of the statutory annual recurrence of criminal liability. Since such assistance existed in each year as to that respective year's taxes, and perhaps inferentially, though not inevitably, as to the preceding year's or years' taxes by virtue of the Government's failure earlier to discover the scheme, no prejudice and no untruth in allegation occurred. *Where there is no prejudice, no reversible error results from duplicity.*[10]

*No Prejudice Where A Sentence Is Supported by One Valid Count.* It is most important to recognize the fact that the judgment of sentence and fine on each of the substantive counts was to run concurrently with that imposed on the first count. Under the well-settled rule, if one count supports the judgment, it will not be overruled even though other counts do not sustain the judgment.[11]

Does not the first count sustain the judgment? What is the sentence and fine? Are they not merely the maximum penalty for one found guilty as an aider and abettor, *i. e.,* as principal (and not accessory) in attempt to evade?

Reading this evidence with a most indulgent eye and giving the verdict the credence and weight which is its due in a criminal case, I can not, in all generosity to these defendants, charged with attempting to evade, or assisting in such evasion, find it possible to say there was no evidence for *any* of the years, 1936 to 1939, to sustain the verdict and judgment.

*Statutory Reference in Count to the "Attempt" Statute, Not the "Accessory After the Fact" Statute.* The counts of the indictment here challenged refer to but *one* statute as the foundation of the indictment, namely, the statute making it an offense to attempt to evade income taxes, 26 U.S.C.A. Int.Rev.Code § 145. It does not cite the "accessory after the fact" statute, 18 U.S.C.A. § 551. The indictment uses substantially the phraseology of said statute and specifies the crime to be, *inter alia,* a "felonious" aiding and abetting, which it could not be if the charge were one of accessory after the fact, which is a misdemeanor.

*Bill of Particulars Indicated Single Offense of Aiding Was Charged.* The bill of particulars (Part VI, A) is illuminative of the pleading in the indictment relative to the "continuous" nature of the aiding and abetting, namely, that the *identical* scheme for aiding continued throughout the years, *i. e.,* the fictitious ownership of the various houses, the filing of false returns, each rel-

[7] Capone v. United States, 7 Cir., 56 F.2d 927; Sondericker v. United States, 7 Cir., 41 F.2d 144, see also, Meyer v. United States, 7 Cir., 258 F. 212; Johnson v. Biddle, 8 Cir., 12 F.2d 366; Farley v. United States, 9 Cir., 269 F. 721; Sugar v. United States, 6 Cir., 252 F. 74, 75; United States v. Socony Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.

[8] United States v. Meyering, 7 Cir., 54 F.2d 621.

[9] Clayton v. United States, 4 Cir., 284 F. 537; Morgan v. United States, 8 Cir., 148 F. 189; United States v. Rogers, D. C., 226 F. 512.

[10] Morgan v. United States, 8 Cir., 148 F. 189; Bailey v. United States, 6 Cir., 278 F. 849; Lewellen v. United States, 8 Cir., 223 F. 18; Nudelman v. United States, 9 Cir., 264 F. 942; Wetzel v. United States, 9 Cir., 233 F. 984; Sparks v. United States, 6 Cir., 90 F.2d 61; Clayton v. United States, 4 Cir., 284 F. 537.

[11] Neu v. United States, 7 Cir., 10 F.2d 146; Hawkins v. United States, 7 Cir., 14 F.2d 596; Reuben v. United States, 7 Cir., 86 F.2d 464; Aczel v. United States, 7 Cir., 232 F. 652, 653; Greenburg v. United States, 7 Cir., 253 F. 728; Taylor v. United States, 7 Cir., 2 F.2d 444; Clifton v. United States, 45 U.S. 242, 4 How. 242, 11 L.Ed. 957; Claassen v. United States, 142 U.S. 140, 12 S.Ct. 169, 35 L.Ed. 966; Powers v. United States, 223 U.S. 303, 32 S.Ct. 281, 56 L.Ed. 448; United States v. Trenton Potteries, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700.

ative to the particular year's taxes attempted to be evaded. Even as to acts which might most readily be construed to be acts of an accessory after the fact, such as in Part VI A 10 of the bill of particulars—"On December 29, 1939, * * (co-defendants) made a false statement to certain Internal Revenue officers." But this accusation is followed not by a charge of being accessory after the fact, but by the allegation "and thereby did then and there knowingly *aid and assist* said Johnson in *wilfully attempting to evade* and defeat * * the payment of his individual income taxes * *."

*Instruction Was Only for Offense of Aiding.* The charge to the jury covered *solely* the "aiding and abetting offense" and a reading of the statute providing therefor and making an aider a principal.[12] The court in instructing the jury said

"Generally speaking, counts 1, 2, 3 and 4 charge the defendant William R. Johnson with willful attempt to defeat and evade income taxes alleged to be due * * and charge the other defendants with aiding, abetting, inducing and procuring the defendant Johnson in his attempt to defeat and evade. (Then quotes the statutory provision on aiding and abetting.)

"Accordingly, it is the law that one who aids, abets, counsels, commands, induces or procures the commission of a crime is a principal, and you may consider Counts 1, 2, 3 and 4 of the indictment as charging that all of the defendants wilfully attempted to evade and defeat the income taxes alleged to be due from * * Johnson * *."

*Sentence Was Only for Offense of Aiding.* The sentences of the co-defendants were solely for the "aiding and abetting" offense (and conspiracy). There was therefore no prejudice to the defendants, and it is indicative, as was the instruction, that but one offense was alleged, tried, and found.[13]

*Indictment in Language of Statute Sufficient.* The offense of aiding and abetting was charged in substantially the language of the statute, and is sufficient. It was not subject to demurrer, motion to quash or demand to elect. The indictment charges the co-defendants did "unlawfully, feloniously, wilfully, and knowingly, *aid, abet,* conceal, *induce* and *procure* the said defendant Johnson * * to attempt in the manner aforesaid to evade and defeat the income tax." The "aider" statute provides, whoever "*aids, abets,* counsels, commands, *induces,* or *procures* its commission, is a principal." 18 U.S.C.A. § 550. These two phraseologies are sufficiently parallel to render the former an allegation simply of an aider of the attempt and an allegation of the offense in the statutory terms, and therefore valid.[14]

---

[12] In Lewellen v. United States, 8 Cir., 223 F. 18, 20, the court said:

"It is probable that the United States attorney * * * was either uncertain about the law or the facts of the case, and attempted to make averments in one count charging both offenses. This was not permissible; but as there was no special demurrer for duplicity or other attack upon the indictment, and as the trial judge instructed the jury concerning the law governing the second mentioned offense only, namely, the carrying of liquor from without the state into the Indian Territory, and as under that charge the defendant was found guilty 'as charged in the indictment' and sentenced accordingly, this court will treat the indictment in the same way, as charging a violation of the offense denounced by the Act of 1895 only."

In Wiborg v. United States, 163 U.S. 632, 16 S.Ct. 1127, 1133, 41 L.Ed. 289, the Court said:

"Defendants' counsel did not seek to compel an election, nor in any manner by their motion to arrest or otherwise, to raise the question of duplicity, nor do they now make objections to the proceedings on this ground. The district judge instructed the jury that the evidence would not justify a conviction 'of anything more than providing the means for aiding such military expedition by furnishing transportation for their men * * *.' Under these circumstances, the verdict cannot be disturbed on the ground that more than one offense was included in the same count of the indictment, but it must be confined to the offense to which the jury were confined by the court."

[13] Refusal of trial courts to direct an election of offenses charged has been held to be non-prejudicial where but one sentence was imposed. Nudelman v. United States, 9 Cir., 264 F. 942; Wetzel v. United States, 9 Cir., 233 F. 984.

[14] Tinkoff v. United States, 7 Cir., 86 F.2d 868; Capone v. United States, 7 Cir., 56 F.2d 927; Yip Wah v. United States, 9 Cir., 8 F.2d 478; Rowan v. United States, 5 Cir., 281 F. 137; Jelke v. United States, 7 Cir., 255 F. 264; Peck v. United States, 7 Cir., 65 F.2d 59; Chiaravalloti v. United States, 7 Cir., 60 F.2d 192; Guzik v. United States, 7

3. *Witness Clifford's Answer to Hypothetical Question.* The majority opinion stresses the error arising from the Government's accountant Clifford's testimony, who it is contended, by defendants, usurped the jury's function,[15] when answering a hypothetical question—to the effect that Johnson had a taxable income in excess of that which he reported.

It is conceded that hypothetical questions have their proper place, but they must be predicated on stated "assumptions" as to evidence presented, and the witness is not to be permitted to decide the ultimate facts and thereby usurp the jury's function.

But merely studying the quotations of the record given in the majority opinion it is obvious that the answers were to questions framed on assumptions. He is asked the amount of Johnson's income, say for 1936, *according to his computations,* with "exhibits and evidence in the record" "used as a basis for his computation." The "exhibits and evidence" were Johnson's tax returns, certified copies of local assessment lists, escrow agreement, Bon Air records, accountant Horwath's records, etc."

An accountant may be permitted to total income from all the sources mentioned in the exhibits he has identified, and state such total solely as *"his computation."* The defendants can in defense show their evidence, and the jury's function is to make their own computation, guided, if they wish to be, by the accountants for the respective sides.

Whether or not Johnson had income in excess of that which he reported was one of the facts which the jury had to determine from all the evidence. The jury could and probably did reject some evidence as not credible or relevant. If it did not believe the Bon Air records were pertinent to

Johnson's income tax liability, they could be discarded, and the jury could also throw out Clifford's conclusions along with it.

We are here dealing with a long trial wherein the defendants exercised their right to a jury trial. We cannot assume that the jury failed to properly weigh the evidence or that it lacked the intelligence to understand what the charge involved and the nature and quantum of proof necessary to sustain the charge. *It would indeed be hard to believe that any juror failed to understand that the witness' answer was not based on said witness' assumption of taxable income.*

Both counsel cite the Guzik case, supra, 7 Cir., 54 F.2d 618, 619. The case favors the Government's contention though not a square holding that the identical question here under review was proper. It was there said:

"Objection was made to the submission of a hypothetical question asking a witness to calculate the amount of tax which would be due on the assumption that the government's evidence (bank deposits and dividends, etc.) reflected taxable income. Since the computation is merely an arithmetical process, thereby avoiding any difference of opinion as to the result, the objection must be considered as directed to the assumption that the items set forth were income. Objection was also made that such question did not include certain other facts tending to show losses. In discussing the limitations on hypothetical questions, Jones, in his Commentaries on Evidence, states: ' * * * Where the facts are in dispute it is sufficient if a hypothetical question fairly states such facts as present the examiner's theory of the case. It cannot be expected that the interrogatory will include all the contentions or theory of the adversary, since this

---

Cir., 54 F.2d 618; Wygant v. United States, 9 Cir., 6 F.2d 148; Pounds v. United States, 171 U.S. 35, 18 S.Ct. 729, 43 L.Ed. 62; Ledbetter v. U. S., 170 U. S. 606, 18 S.Ct. 774, 42 L.Ed. 1162.

[15] On the "usurping of the province of the jury" Wigmore states, § 673:

"This being the plain, logical, and necessary reason for the use of the hypothetical question, it will easily be seen that it is not resorted to from any fear that the witness will 'usurp the function of the jury.' This bugbear, vigorously denounced with sentimental appeals to the value of jury trial, has been made to serve again and again as the dreadful source of those evils which the hypothetical question enables us to avoid. But the expert is not trying to usurp that function, and could not if he would. He is not trying to usurp it, because his error, if any, is merely the common one of witnesses, that of presenting as knowledge what is really not knowledge. *And he could not usurp it if he would, because the jury may still reject his testimony and accept his opponent's,* and no legal power, not even the judge's order, can compel them to accept the witness' statement against their will. * * * The 'usurpation' theory *. * has done much to befog bench and bar, and to assist in producing some of the confusion which attends the precedents."

would require a party to assume the truth of that which he generally denies. * * * Each side, in an issue of fact, has its theory of what is the true state of the facts, and assumes that it can prove it to be so to the satisfaction of the jury, and so assuming, shapes hypothetical questions to experts accordingly. A question should not be rejected because it does not include all the facts of which there is any evidence at all. * * * Generally speaking the trial court is the arbiter of the propriety of the question; and the real test of the propriety of any given hypothetical question is its fairness. * * *' We conclude that the government's assumption that the receipts constituted evidence of income was the valid basis for the hypothetical question submitted. The jury still had to determine the controverted issue of whether the assumption were correct."

If one were to frame a technically correct hypothetical question in this kind of case, the preamble would be so long the jury would be unable to retain the facts on which the question was predicated. Hundreds of items would need to be considered in determining Johnson's annual income. A hypothetical question including them in its premise would be of doubtful value.

Moreover, guilt does not depend on a finding that every item which the Government claims should be included, be accepted by the jury. It was not every item which was decisive of the outcome.

Another factor in the framing of hypothetical questions arises where the witness has just testified to the facts on which the question is based. That was the case here. In such instances, it is hardly necessary (unless the situation necessitates the recital so that the jury will understand the answer) that all the testimony which he has just given should be restated at length in the question.[16]

4. It is contended that the proof does not sustain the conspiracy charge—i. e., appellants were not shown to have conspired specifically to aid Johnson in his attempt to defeat his income tax. It may be admitted that they acted jointly, even conspired, but, so it is argued, the object of their joint action was not to defraud the U. S. Government out of its income taxes, but to avoid prosecution of the Illinois statutes dealing with gambling.

The jury found that the income of the respective houses belonged to Johnson by virtue of his ownership of them—a fortiori, neither the income nor the houses belonged to the co-defendants, and they therefore were intentionally combining to mislead the Government in income tax matters by filing tax returns as owners of the houses when in fact they knew the houses and their income belonged to Johnson, and should have been reported by him. It would be strange that this same group should go on year after year filing these deceptive returns if it were not done pursuant to an agreement of each co-defendant with Johnson.

The rather nebulous strands with which the Government's evidence wove the several defendants together convinced the jury that each defendant knew his place in the scheme and knew of the others' participation. We cannot review such evidence. The credibility of the witnesses, some in denying all intent of conspiracy to attempt to evade income tax, and others, in giving evidence of a common enterprise, to deliberately mislead the Government in its ascertainment of income received—is not for us to review. The jury alone must weigh the words of those who appear before it and neither this nor the district court can set aside its findings.

---

16 Wigmore, Sec. 675. "But does it follow that, when the opinion comes from *the same witness* who has received the basis of it by actual observation, those premises must be stated beforehand, hypothetically or otherwise, by him or to him? For example, the *physician is* asked, 'Did you examine the body?'; 'Yes'; 'State your opinion of the cause of death.' Is it here necessary that he should first state in detail the facts of his personal observation, as premises, before he can give his opinion?

"In academic nicety, yes; practically, no; and for the simple reason that either on direct examination or on cross-examination each and every detail of the appearance he observed will be brought out and thus associated with his general conclusion as the grounds for it, and the tribunal will understand that the rejections of these data will destroy the validity of his opinion.

"Through failure to perceive this limitation, Courts have sometimes sanctioned the requirement of an advance hypothetical statement even where the expert witness speaks from personal observation. * * But this fallacy of being too unpractical in forcing the logic of the theory is generally and properly repudiated."

It should also be mentioned that the sentence imposed upon the conspiracy count (which punishment is lesser than on the substantive counts) was by the judgment made to run concurrently with the other sentences, so that reversal can not be won for insufficiency of the evidence to support the conspiracy count, if any substantive count supports the judgment.

It may be admitted, so it is argued, that all the defendants acted jointly, even conspired together, but the object of their joint action was not to defraud the United States Government out of its income taxes, but to avoid prosecution for gambling under the Illinois statutes.

It is, of course, conceded, that a conspiracy may be established by circumstantial evidence. But, defendants argue, it must be established,—and the conspiracy must be the one charged in the indictment. To meet this requirement, the Government's proof disclosed deceptive ownership of gambling houses and the filing of income tax returns by co-defendants, as owners, when, in fact, neither the property nor the income was theirs. This alone not only *tended* to establish, but rather conclusively *proved* the joint effort was to avoid income taxes, not to avoid local prosecution for gambling. Rather persuasive is the argument that no other motive could have prompted the defendants to falsely deny to Government investigators the ownership of the houses. For it is hardly conceivable that individuals would falsely subject themselves to income tax liability if the conspiracy was not to evade the income tax of the large taxpayer. The jury was justified in assuming that the crux of this case turned on the answer to the question, To whom did the gambling houses belong and who was entitled to the income from their operations?

If these houses belonged to Johnson and he was entitled to the income and he excluded such income from his income tax returns and other defendants included such income as part of their returns when it was not in fact their income, then the crimes charged in the indictment were established. Of this there can be no doubt.

The proof of the ownership of the property, as well as the income, was not even circumstantial in character. It was direct and positive. Defendants' only hope of escaping from its telling effect was to show the testimony of the Government witnesses to be false. This they endeavored to do. Apparently the jury disbelieved their witnesses and accepted the testimony of the Government witnesses. Reduced to its last analysis, this issue determined the merits of the case. We have been favored with instructive briefs. A clearer case for the jury could hardly be presented.

There are many other assignments of error. The trial was long and the questioned rulings are numerous. The trial court's refusal to instruct the jury as requested; its rulings on admission and rejection of evidence; its participation in the examination of witnesses—all come in for criticism and challenge.

In short, it is earnestly argued that the defendants were not given a fair trial.

The case was one which necessitated great care to prevent, if possible, the prejudice which jurors might naturally entertain against individuals who admitted they had long been, and were professional gamblers operating on a big scale, from affecting their deliberations of the charges stated in the indictment and which did not involve crimes arising out of their gambling operations.

Defendants were entitled to a fair trial on the charges preferred against them. Their guilt of offenses not charged in the indictment had no bearing (save as it may have affected credibility) on the charges set up in the indictment. In order that our judicial system and practice in criminal cases be vindicated, the utmost care is required so that no ruling or comment by the court take place which would have the effect of communicating to the jury an impression that the court was unfavorable to defendants.

In view of the fact that the case is to be reversed according to the majority opinion, I call attention merely to one comment of the trial judge to show its fairness.

The court said:

"You must not permit the kind of business in which the defendants were engaged to prejudice you against them or any of them. The fact, if it be a fact, that some defendant or defendants committed some offense against the laws of the United States or the State of Illinois other than those charged in the indictment creates no presumption that such defendant or defendants committed the offense here charged against him or them."

The language speaks for itself. It was clear, explicit and positive. Defendants could not ask for more. Their requests

may have been more wordy and more argumentative, but they did not better state the law than the foregoing instruction.

It was not necessary that the trial court give instructions in the language of defendants' counsel, provided the substance of this proposed charge was clearly and fairly stated. The charge is often better when couched in the language of the judge for it is fairer and less argumentative and prejudicial.

There are two different theories or conceptions of trials in criminal cases. I am speaking of trials in criminal cases in general—in the abstract, not referring now to the instant case. The one which appeals to me as the better one views the trial as a means of ascertaining a fact,—that fact being the guilt or innocence of the accused.

Rules governing such trials favor the accused. This policy of favoring the accused is the result of generations of experience. It has, for its background the concept of making certain that no innocent person shall be convicted,—that it is better that many who are guilty be acquitted than one innocent person be convicted. The rules which ordinarily accomplish this result are too well known to require restatement.— Except for them, a fair trial in a criminal case is quite similar to that in a civil case. In both cases, it should be a search, through competent and relevant evidence of the best nature, for the truth.

On one side is society seeking to protect itself and restrain the violator from stepping outside the law to enrich himself or to accomplish a selfish end at the expense of others. On the other side is the accused, in whose favor presumptions are created to protect him in the enjoyment of his liberty and in his reputation as one of a society of law-abiding citizens.

Although the personal element will always be more pronounced in a criminal case than in a civil suit, the controversy should, in the last analysis, be simply an honest inquiry into the accused's guilt or innocence.

The other theory of a trial in a criminal case is entertained by members of the bar engaged chiefly in handling criminal cases. To them it is a fencing contest between counsel, where the real issue of fact, to-wit, the guilt or innocence of defendant is lost in the heat of the duel between opposing counsel. The sole effort is to inject error into the trial. The longer the trial the better the chance of error. Hence a jury trial is demanded for the opportunities of injecting error are thereby multiplied. And every erroneous ruling is presumptively, prejudicial.

This theory finds some support in early judicial precedents. Such holdings rise to dominant importance, if only they be in point.—And that is so regardless of their vintage or the absence of sound reason to support them. In this view all later cases ignoring or inferentially overruling such earlier precedents, are brushed aside as out of harmony with the rule which gives the accused the benefit of all doubts. This view necessitates the rejection of reason and all growth, change, or development of the law in the field of criminal trials.

Admittedly this view makes for excitement and uncertainty in criminal cases, emphasizes the emotional side of all participating therein, and gives to the public—particularly the curious public, an opportunity for a thrill. In my opinion it is not promotive of justice, places a premium on long trials, adds to the expense, encourages questionable practices and often brings the administration of justice into disrepute with law-respecting and the law-abiding citizen.

A jury trial is demanded, *not* because of greater faith in the jury's ability to ascertain the truth, but because jurors are often more easily confused by a long trial and errors are more likely in a long jury trial.

Stipulations of facts are never made, not because the facts are uncertain or unknown, but because some technical error may occur in the introduction of their proof, or the prosecution may have difficulty in securing the attendance of all its witnesses at one time. A pretrial conference is never held because the court is powerless to call one. There is no effort, as in a civil case to confine the trial to the controverted issues. In short, the protection of society against the raids of its transgressors is overlooked or forgotten, and the decision goes according to the technical rules of the fencing contest.

It seems to me that the holding of the majority of the court is a vindication of the second theory above referred to. No prejudice to defendants is shown. A fairly drawn grand jury presented a charge and a trial with conviction, occurred. Not merely is there a reversal, but reversal with a resulting dismissal. And this is because a grand jury obtained an order for its continuance so as to complete its investigation. Because perchance, its investigation may

have exceeded the crimes uncovered at its first term's study, its authority to act in any and all respects is lost.

On the entire record I am convinced that there was no prejudicial error committed, and that the judgments should be affirmed. In view of the length of this opinion, and also because the case must be dismissed, I will not discuss the alleged error in admitting evidence which showed the operation of a large, modern Chicago gambling house.

On Petition for Rehearing.

MAJOR, Circuit Judge.

In connection with the petition for rehearing, plaintiff has sought and obtained leave to file a transcript of the testimony of the witness Clifford. This was desired because of statements made in the majority opinion that the witness volunteered certain testimony, that he testified in certain instances without a question, and perhaps other statements of similar purport. An examination of the transcript of the testimony of this witness discloses that such statements in the majority opinion were erroneously made and that all the testimony given by him was in response to questions.

The majority opinion is therefore modified in this respect so as to reflect the true situation. Such modification, however, does not affect the holding of the majority relative to the erroneous nature of his testimony. After a study of the petition for rehearing, the court is satisfied that there is nothing presented which requires further consideration. Judge EVANS adheres to the views expressed in his dissenting opinion. The petition for rehearing is therefore denied.