### REUBEN v. UNITED STATES. *

### LAVEN v. SAME.

### ROLLNICK v. SAME.
#### Nos. 5746–5748.

Circuit Court of Appeals, Seventh Circuit. Oct. 23, 1936.

Rehearing Denied Dec. 16, 1936.

*Writ of certiorari denied 57 S. Ct. 513, 81 L. Ed. —.

Myer H. Gladstone, of Chicago, Ill., for appellant Reuben.

Sidney G. Kusworm, of Dayton, Ohio, for appellant Laven.

I. Harvey Levinson, of Chicago, Ill., for appellant Rollnick.

Michael L. Igoe, U. S. Atty., and Warren Canaday and Edmond Sullivan, Asst. U. S. Attys., all of Chicago, Ill., for the United States.

Before EVANS and SPARKS, Circuit Judges, and BRIGGLE, District Judge.

BRIGGLE, District Judge.

The indictment in this case charged the defendants in seven counts with a scheme to defraud and the use of the United States mails in the furtherance of the same, in violation of section 215 of the Criminal Code, 18 U.S.C.A. § 338.

The first count, among other things, charged that defendants "had devised and intended to devise a certain scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises from a certain class of persons who were desirous of making paying and profitable investments in stocks of corporations, which stocks of corporations were listed and traded in on stock exchanges in the United States. * * *

"That the said defendants, so having devised and intending to devise the said scheme and artifice, did adopt and use the name of Paul A. Leschuck & Co., and did represent to said persons intended to be defrauded that the said Paul A. Leschuck & Co. were dealers in investment securities, and that said Paul A. Leschuck & Co. had and maintained an office in the City of Chicago, in the State of Illinois, and that said Paul A. Leschuck & Co. would furnish and send to the said persons intended to be defrauded information in regard to stocks of corporations listed and dealt in on stock exchanges throughout the United States without any charge to the said persons intended to be defrauded in selling and disposing of stocks, bonds, and other securities held and owned by the said persons intended to be defrauded in regard to making paying and profitable investments of the money of the said persons intended to be defrauded, which said representations and promises were and would be sent and transmitted to the said persons intended to be defrauded by and through the United States mails, * * * and that persons desirous of making paying and profitable investments in stocks so dealt and traded in on stock exchanges throughout the United States should send and transmit to the said defendants under the said name of Paul A. Leschuck & Co., stocks, bonds and other securities held and owned by the said persons intended to be defrauded, and that the said persons intended to be defrauded should send and transmit to the said defendants under the said name of Paul A. Leschuck & Co., money to be invested by the said Paul A. Leschuck & Co. for the purchase of stocks which, it had been and was represented by the said defendants, would enhance and increase in price, and that they, the said defendants, so operating under the said name of Paul A. Leschuck & Co., would hold the stocks and bonds and other securities sent to the said Paul A. Leschuck & Co. as security for the purchase of the stocks which it had been stated would enhance and increase in price and that all moneys transmitted and sent to the said defendants under the said name of Paul A. Leschuck & Co. would be applied on the purchase of stocks from the said Paul A. Leschuck &

Co. by the said persons intended to be defrauded ・ * * *; when in truth and in fact the said defendants intended at all times to sell and dispose of all stocks, bonds, and other securities sent and transmitted by the said persons intended to be defrauded to the said Paul A. Leschuck & Co., and would keep and retain for the use and benefit of the said defendants all moneys obtained by the said defendants from the sale and disposal of the said stocks, bonds and other securities, and would also keep and retain for the use and benefit of the said defendants all moneys transmitted to the said defendants under the said name of Paul A. Leschuck & Co., and neither the said Paul A. Leschuck & Co. nor the said defendants would, or intended to, deliver to the said persons intended to be defrauded any stocks whatever upon payment of the full purchase price of the said stocks by the said persons intended to be defrauded, all of which the said defendants, and each of them, well knew and intended.

"* * * the said persons intended to be defrauded would lose all stocks, bonds, other securities, and money transmitted and sent to the said Paul A. Leschuck & Co.; additional calls and requests for money and/or securities would be made by the said Paul A. Leschuck & Co., and at no time would the said persons intended to be defrauded make or receive any profit on the purchase of stocks offered for sale to the said persons intended to be defrauded by the said Paul A. Leschuck & Co., but would lose all stocks, bonds, securities and moneys transmitted and sent to the said Paul A. Leschuck & Co., all of which the said defendants, and each of them, well knew and intended."

The count then charged the transmission of certain mail matter on December 18, 1931, to a certain named individual in furtherance of such alleged scheme.

All succeeding counts adopted the allegations of the first count as descriptive of the scheme, but charged defendants with the mailing of a separate document in each instance, setting the same out in hæc verba The date of mailing alleged in the second count was January 12, 1932, in the third count, February 23, 1932, in the fourth count, June 6, 1932, in the fifth count, June 30, 1932, in the sixth count, July 27, 1932, and in the seventh count, August 3, 1932.

Eight persons were named as defendants in the indictment, but the appellants Leonard J. Rollnick, Ben Reuben and Barney Laven were the only ones tried in this proceeding. All were convicted on all counts, and the District Court imposed a fine of $1,000 against each and sentenced each to a penitentiary—Rollnick for 3½ years, Reuben for 3 years, and Laven for 2 years. The sentence imposed was general and not allocated to any specific count.

Each defendant has prosecuted a separate appeal (here consolidated), and by the several assignments of error many questions are raised. Rollnick has discovered 83 mistakes of the District Court, Reuben only finds 32, and Laven, while only finding 29 originally, has by diligence increased his assignments to 46.

An analysis of such assignments of error discloses that a very large number of them deal with alleged errors in the reception and exclusion of evidence. No good purpose would be served by a detailed discussion of these various rulings. In such an extended and tedious trial as this, it was inevitable that error should appear, but our examination of the record convinces us that the trial was as free of error in this respect as it was humanly possible for it to be, and we find none that substantially affected defendants' rights.

■ Other assignments challenge the sufficiency of the evidence to establish the guilt of defendants. The evidence produced by the government was in large measure the testimony of alleged accomplices, some of whom had entered pleas of guilty and others of whom it was asserted were to receive leniency at the hands of the government, in consideration of their testifying. A very large part of the defendants' argument deals with the weight to be given such testimony. The testimony of an accomplice is of course to be viewed with caution, but when submitted to a jury under proper instructions may not be disregarded solely on the ground that such witnesses are accomplices or that defendants, by their testimony, assert a different version of the controverted facts.

Furthermore, the record furnishes corroboration in the testimony of witnesses other than the alleged accomplices. We cannot here detail all such proof, but typical of it is the testimony of Tate B. Collins, retired Major in the United States Army, which is, as follows: "I saw an ad in a financial paper and requested Paul A. Leschuck and Co. to send me circulars, which I received. They called me on phone in West Point, N. Y. and asked me to buy Standard Oil, which I did. Received confirmation. Asked by phone to buy more

Standard Oil. Bought 200 shares and sent 200 shares of Chrysler as collateral. Later bought more Standard Oil by telephone. By this time I had advanced $1800.00 in cash and the 200 shares of Chrysler as collateral. Received call that Standard Oil had advanced as far as possible and agreed to sell. Immediately after this I wrote to withdraw $1500.00 from my account. I was then urged by telephone not to withdraw the $1500.00 but to invest it in Mercantile Finance which the voice assured me was a large financial corporation in Chicago, in good financial condition, paying dividends regularly, and would increase my profit to $5000.00. On inquiry, I was told that the stock was not listed on the big board, but was on the curb. I assumed New York curb and authorized the salesman to buy 1000 shares. I could not find the stock listed in the newspaper but found by calling the Chicago salesman that the stock was on the Chicago curb. I informed him that I did not wish to trade on the Chicago curb and asked him to sell. He advised me to wait. I again called Chicago a few days later and ordered the stock sold. He again advised waiting, but I ordered a sale regardless of loss. I did not get a confirmation of sale the next morning and came to Chicago. * * * (The stock had not been sold). Up to and including May 16, 1933, I received nothing for the money and stock which I turned over to Paul A. Leschuck and Co. in full for the stock I purchased. I would judge the debit balance owed them on the day I requested them to sell the Mercantile Finance was around $6000.00. I did not tender the $6000.00."

An analysis of this testimony, when viewed in the light of the testimony of other witnesses, including the so-called accomplices tends very strongly to show that the purpose throughout of Leschuck & Co. was to get its customers in debt to them to a point where they could not cover, and thus seemingly to justify the confiscation of such cash and securities as the customer had intrusted to them.

It is also asserted that the government's theory was that Leschuck & Co. (at the instance of defendants) manipulated the market on certain stocks sold to customers, thus requiring the deposit of further funds to an extent that could not or would not be met, with a deliberate intent of freezing purchasers out and excusing delivery; and defendants claim that the government failed by the evidence to establish such manipulation, and for that reason the prosecution must fail. In the view we take, it was not incumbent on the government under the indictment to establish that defendants actually manipulated or attempted to manipulate the market, although there is evidence in the record strongly supporting this theory.

■ We think the court properly instructed the jury with reference to the testimony of accomplices and we are not now concerned that the jury adopted such testimony in preference to that of defendants. The question of its weight was exclusively their question. This court's duty on the fact question is limited to the inquiry of whether there was substantial competent evidence to be submitted to the jury. Rabideau v. U. S. (C.C.A.) 40 F.(2d) 909; Gerard v. U. S. (C.C.A.) 61 F.(2d) 872; Cherry v. U. S. (C.C.A.) 78 F.(2d) 334. The burden of defendants' argument is, not that there was no evidence to support the charge of the indictment, but that it was unworthy of belief and not substantial and should not have been submitted to the jury. We cannot adopt this view. Our investigation of the record convinces us that the case was properly submitted to the jury, and we would not be warranted in disturbing their conclusion on the facts.

■ It is also earnestly urged that the defendants were prejudiced by the government's cross-examination of certain character witnesses produced on behalf of defendants. For example, Wm. Duggan and Lewis Stark were called as character witnesses for defendant Rollnick and testified that this defendant bore a good reputation for honesty and integrity and as a law-abiding citizen. The following are some of the questions put by the District Attorney on cross-examination which were objected to:

"Do you know whether or not Mr. Rollnick had an interest in the bulletin known as the Financial Criterion which was barred from the Canadian Mails?" (Objection sustained.)

"Did you know that on or about February 20, 1930, Wm. L. Jarvis, Abner Werblin and Leonard Rollnick had been enjoined from dealings in stocks and securities by the Supreme Court of New York?" (Objection overruled.) Ans. "I do not."

"Did you know that he was barred from dealing on the New York Stock Exchange?" The Court: "He may answer whether he knows anything of that sort."

The proper inquiry to be put to a character witness who has testified to the good reputation of a defendant concerns what the witness may have heard of a disparaging nature about the defendant and does not include proof or assumption of any specific acts of misconduct, for indeed the general reputation of a citizen is made up to a very large extent of what others say about him. Lawrence v. U. S. (C.C.A.) 56 F.(2d) 555; Spalitto v. U. S. (C.C.A.) 39 F.(2d) 782.

The generally accepted rule, its virtues and its vices, are dealt with by Professor Wigmore in volume 2, § 988 of the Second Edition of his work on Evidence, in the following language:

"The settled rule against impeachment by extrinsic testimony of particular acts of misconduct is to be distinguished in its application from a kind of questioning which rests upon the principle that the witness' grounds of knowledge may always be inquired into. When witness A is called to support the character of B (either a witness or an accused), by testifying to his good reputation, that reputation must signify the general and unqualified consensus of opinion in the community. Such a witness virtually asserts either (a) that he has never heard any ill spoken of him or (b) that the sum of the expressed opinion of him is favorable. Now if it appears that this sustaining witness knows of bad rumors against the other, then, in the first instance, his assertion is entirely discredited, while in the second instance, his assertion is deficient in good grounds, according to the greater or less prevalence of the rumors. On this principle, then, it is proper to probe the asserted reputation by learning whether such rumors have come to the witness' knowledge; for if they have, it is apparent that the alleged reputation is more or less a fabrication of his own mind. It is to be noted that the inquiry is always directed to the witness' hearing of the disparaging rumor as negativing the reputation. There must be no question as to the fact of the misconduct, or the rule against particular facts would be violated; and it is this distinction that the Courts are constantly obliged to enforce. * * *

"On this principle inquiries are almost universally admitted. But the serious objection to them is that practically the above distinction between rumors of such conduct as affecting such reputation and the fact that it is violating the rule against particular facts cannot be maintained before the jury. The rumor of the misconduct, when admitted, goes far in spite of all theory and of the judge's charge, toward fixing the misconduct as a fact upon the other person, and thus does three improper things: First, it violates the fundamental rule of fairness that prohibits the use of such facts; second, it gets at them by hearsay only and not by trustworthy testimony; and third, it leaves the other person no means of defending himself by denial or explanation such as he otherwise would have had if the rule had allowed the conduct to be made the subject of an issue. Moreover, these are not occurrences of possibility but of daily practice. This method of inquiry or cross-examination is frequently resorted to by counsel for the very purpose of injuring by indirection the character which they are forbidden directly to attack in that way; they rely upon the mere putting of the question (not caring if it is answered negatively) to convey their covert insinuation. The value of the inquiry for testing purposes is often so small, and the opportunities of its abuse by underhanded ways are so great, that the practice may amount to little more than mere subterfuge and should be strictly supervised by forbidding it to counsel who do not use it in good faith."

We do not approve of the form of some of the questions of the cross-examiner put to the defendants' character witnesses, but it must be borne in mind in connection with the given example that the District Court sustained the objection to the first question, the witness gave a negative answer to the second, and the court indicated some qualification of the third. With this in mind, and in the light of the court's subsequent instructions to the jury, we are convinced that defendant Rollnick was not prejudiced by such cross-examination. Likewise, our consideration of the record convinces us that no reversible error was committed in the cross-examination of other character witnesses referred to in the assignments of error.

Defendants also urge that in any event they were wrongfully convicted on certain counts of the indictment for the reason that the evidence shows that at some of the dates on which mailing was charged they had no connection whatever with the business of Leschuck & Co., or with the alleged scheme.

The defendants are not charged in the indictment with violation of the conspiracy statute, but they are charged in apt terms

with a unity of purpose and action in the alleged scheme to defraud and the use of the mails. The operation of the alleged scheme is said to have continued from December, 1931, to August, 1932. Rollnick contends that he severed all connection on February 10, 1932; Laven claims not to have been interested or implicated in any fashion until February, 1932, when he succeeded Peter J. Greene as office manager.

One or more persons can originate and carry out a scheme to defraud and any number of persons can operate the plan, each doing his part after the machinery is put in motion; and it would be of no consequence that each and all did not actively participate in the several acts of mailing if each were aiding and advising in the furtherance of the scheme. While defendants were not charged with or tried for the specific offense of conspiracy, the charges and proof herein very strongly supported many of the elements of conspiracy, such as the asserted common scheme, the harmony of the actors, and their concert of action.

In Davis v. U. S. (C.C.A.) 12 F.(2d) 253, 257, the Court, citing U. S. v. Gooding, 12 Wheat. 460, 6 L.Ed. 693, and Brown v. U. S., 150 U.S. 93, 14 S.Ct. 37, 37 L.Ed. 1010, said, "Although conspiracy be not charged, if it be shown by the evidence to exist, the act of one or more defendants in furtherance of the common plan is in law the act of all." In the instant case mailings on various dates were alleged, but all were alleged to be a part of one scheme which was before the jury for consideration. The jury heard evidence in support and in defense of such charge. They had a complete picture and should have been better able to judge the relation of the defendants than if each one were isolated. The cases cited by appellants, McElroy v. United States, 164 U.S. 76, 17 S.Ct. 31, 41 L.Ed. 355; Nazzaro v. United States, 56 F.(2d) 1026; Zedd v. United States (C.C.A.) 11 F.(2d) 96; Coco v. United States (C.C.A.) 289 F. 33, would be pursuasive if there were present therein the elements of common knowledge, common purpose, and co-operation. Such cases are to be distinguished from the case here on appeal.

■ Again, even though true that Rollnick may not have been guilty of participation in the mailings which occurred after his asserted withdrawal, and though Laven may not be chargeable with the mailings completed prior to his admitted connection, yet we think this has in no sense inured to their prejudice, for the evidence amply sustains the charge that each at some time was a party to the alleged scheme to defraud. No defendant was given as great a sentence as might have been imposed under one count, and in view of the character of the charge in the indictment, the careful instructions of the court, the fact that the sentences imposed were general and not directed to any specific count, and the failure of defendants to show wherein they have been prejudiced, we think they are in no position to complain.

■ It is also urged that the indictment upon which defendants were tried was void.

The indictment was returned May 16, 1933, and recites on its face that the April term grand jury, having begun but not having finished during said term the matter under investigation, continued to sit at the May term by order of the court. The statute (Title 28 U.S.C.A. § 421) provides that the District Judge, or the Senior District Judge, as the case may be, may authorize a grand jury to sit at the succeeding term. Appellants now, for the first time, assert that the authorization to sit at the May term was not made by either the judge who impanelled the grand jury or the Senior District Judge and, therefore, the grand jury is void.

The section of the statute in question is inaptly worded and nowhere defines what is meant by "the District Judge" or "the Senior District Judge." Whether Congress intended that the words "the District Judge" were to apply only to districts where there was but one judge and that the words "the Senior District Judge" were to apply in all districts where there was more than one judge, and, if so, whether the District Judge who had served more continuous years than his associates was under all circumstances the only judge who could continue the existence of a grand jury or whether in event of his absence or incapacity the next in seniority was to be clothed with such authority and to be considered "the Senior District Judge" within the meaning of this section have become much controverted questions. We do know that Congress has, in relation to judges of the Circuit Court of Appeals, provided that "in case the senior circuit judge of any circuit is unable because of illness or other cause to exercise any power given or to perform any duty imposed by law, such power or duty shall be exercised or performed by the other judges of that circuit in the order of the

seniority of their respective commissions," 28 U.S.C.A. § 216 a.

It would not be in the interest of justice or the orderly administration of the criminal business of the District Courts, if so important a matter as the continued existence of a grand jury were to depend upon the presence and ability to act of but a single individual. But whether Congress has so intended we are not called upon to decide in this case. This question was not expressly raised by defendants in the District Court, but they now assert that their demurrer to the indictment and their motion in arrest of judgment, although general in terms, were proper vehicles for presentation of the point. We think not, for their contention raises questions of fact as well as law. The indictment having shown on its face that the order continuing the Grand Jury was made by the court, we will assume that it was made in compliance with the statute and will not institute an independent investigation to ascertain for the first time which judge made it, when he was appointed a District Judge, when each and every other judge in the District was appointed, which judges, if any, have ceased to be District Judges, in an effort to reach the ultimate determination of whether the judge making the order was in fact the Senior District Judge within the meaning of the statute.

We are justified in assuming, where the indictment recites that the act was done by the court, that it was done by a judge of the court authorized to act.

Other points are raised by the appeal, but we note nothing warranting further discussion; and finding no reversible error, the judgment of the District Court is accordingly affirmed.

---

*Writ of certiorari denied 57 S. Ct. 511, 81 L. Ed. ——.