**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Cheryl MELTON, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Marion COMADOLL,
Defendant-Appellant.**

**Nos. 81–2165, 81–2230.**

United States Court of Appeals,
Seventh Circuit.

Argued May 24, 1982.

Decided Sept. 22, 1982.

Donald G. Weiland, Chicago, Ill., Michael A. Dvorak, South Bend, Ind., for defendants-appellants.

John S. Leonardo, Asst. U.S. Atty., South Bend, Ind., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and FOREMAN,* Chief District Judge.

---

* The Honorable James L. Foreman, Chief District Judge of the United States District Court for the Southern District of Illinois, sitting by

FOREMAN, Chief District Judge.

This is a consolidated appeal taken from a final judgment in a criminal RICO and mail fraud prosecution in which the two appellants, Marion Comadoll and Cheryl Melton, were co-indicted with three others. Comadoll and Melton are the only appellants before the Court. For the reasons given below, we AFFIRM both convictions.

## I.

Appellants were indicted by a federal grand jury in South Bend, Indiana, on March 13, 1981. Both Comadoll and Melton were charged in Count II with conspiring "to conduct and to participate directly and indirectly in the conduct of the affairs of an Enterprise, whose activities affected interstate commerce, through a pattern of racketeering activity in violation of Section 1962(c) and Section 2 of Title 18, of the United States Code ... [i]n violation of Title 18, United States Code, Section 1962(d)."[1] The grand jury charged Comadoll with mail fraud under 18 U.S.C. § 1341 in Counts III and VI, and charged Melton with violating the same statute in Count V.[2]

Appellants' trial commenced May 22, 1981. At the close of the government's case, the district judge upon motion dismissed Count V, Melton's mail fraud count, and Count VI, one of Comadoll's two mail fraud counts. On June 4, 1981, the jury returned guilty verdicts against Comadoll on Counts II and III, and against Melton on Count II. The district court gave Comadoll concurrent five year sentences on Counts II and III and gave Melton five years and a $25,000 fine on Count II. Both filed timely notices of appeal.

The "enterprise" named in the RICO count was a business known as Indiana

designation.

1. Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." Subsection (c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). "Also, a

pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity ..

18 U.S.C. § 1961(5). And "racketeering activity" is defined as:

(A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: section 1341 (relating to mail Fraud), ... section 1951 (relating to interference with commerce, robbery, or extortion), ...

18 U.S.C. § 1961(1). Section 2 of Title 18 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

2. The mail fraud statute provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341.

Rentals or Indiana Construction Company, which was owned and operated by co-defendant Douglas Caton. The RICO count charged that Comadoll and Melton had participated in the affairs of the enterprise for the purpose of defrauding property insurance carriers through a pattern of racketeering consisting of acts of arson, mail fraud and extortion. The Count charged Comadoll with commission of two such acts and Melton with three.

Evidence revealed Caton employed both appellants at the enterprise during the time of the conspiracy. Appellants both lived in housing provided by Caton. Also, there was testimony that Melton enjoyed a close personal relationship with Caton.

With respect to Melton's part in the conspiracy, testimony revealed the following. Melton drove unindicted co-conspirator Thomas Schubert to a residence at 236 East Fox in South Bend, Indiana, so that Schubert could start an arson fire at the house. According to the testimony of Schubert (which Melton later denied) Melton turned off her headlights as they approached the house and asked Schubert to unscrew the dome light to prevent illumination when the car door opened. Schubert entered the house, started the fire, reentered the car, which Melton had driven around the block in the interim. Melton drove Schubert to Caton's house and stated her intention to tell Caton "it's been taken care of" and that Schubert should leave.

Melton and Schubert repeated the same scenario on another occasion for a residence at 829 North 34th Street in South Bend. In addition, Caton placed a residence owned by him at 1657 North Johnson, South Bend, in Melton's name and had Melton procure insurance for the house in her name, but with his money. Caton continued to pay on the mortgage. After asking Schubert to burn this house, Caton reconsidered and instructed Schubert to take gasoline to the vacant house and leave it in a closet. After the house burned a few days later, Caton gave Schubert an envelope containing money, with instructions to deliver it to indicted

co-conspirator Boyd Howard for setting the fire. At Caton's instruction, Schubert handled the insurance claim. A claim was filed and a check delivered by the insurance company. Obviously, the mails were used to accomplish this. Caton used the money to settle the mortgage.

With respect to Comadoll's part, evidence revealed the following. Caton placed a residence at 530 E. Altgeld, South Bend, in Comadoll's name, planning to burn it and recover insurance proceeds. Several people testified that Comadoll told them before the house burned that it was to be set afire. Comadoll arranged to have her things out of the house when, at Caton's direction, Schubert set the fire. An insurance claim was filed and a claims adjustor was paid a kickback of $2,300 by Caton for handling the claim. Comadoll signed a form authorizing payment of insurance proceeds directly to Indiana Construction Company, which indicated satisfactory completion of repairs when in fact work had not begun. A property loss notice was sent in the mail by the agency to the carrier, and the latter issued a $21,789[3] check for structural damage. The check was negotiated by Douglas Caton, James Caton's brother and an indicted co-conspirator. Douglas Caton also negotiated a check for $12,158 for damages to house contents, even though it was made to the order of Comadoll. In five months, the mortgage was paid off.

Schubert burned yet another house at Caton's direction at 1106 Roosevelt, South Bend. Caton hoped to obtain the repair contract and to persuade the owner, John Dylewski, to give Caton the house in return for Caton's assumption of the mortgage. Two checks were issued by the carrier for this fire, one for the structure made out to Dylewski and Colonial Mortgage Company, and one for the contents to Dylewski alone. Both drafts fell into the hands of the claims adjustor, Loren Rosander. In the face of Dylewski's offer to complete repairs for $5,000, and an estimate obtained by Dylewski from a contractor for $6,430, Rosander

---

3. Amounts rounded to the nearest dollar.

insisted that Caton's business handle the repairs for $12,114, the amount of the check issued. Needless to say, Rosander received a kickback from Caton. Before giving Dylewski the check for his personal belongings, Rosander required Dylewski to endorse the structural damage check so that Caton could get the proceeds for his enterprise. The endorsement of the co-payee, Colonial Mortgage, was not made by anyone from that company, but by Comadoll.

## II.

■ Comadoll makes three arguments on appeal, which the Court shall consider in turn. First, she argues that there existed insufficient evidence to sustain the RICO conviction under 18 U.S.C. § 1962(c), since the trial judge dismissed the charge in Count IV, one of Comadoll's two mail fraud counts. The argument is belied by the evidence and reflects appellant's misunderstanding of that which is required for a RICO conspiracy conviction. A series of cases from the Fifth Circuit, cited with approval by this Court, see *United States v. Lee Stoller Enterprises, Inc.,* 652 F.2d 1313 (7th Cir. 1981), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1982), have developed the point. "To be convicted of a conspiracy to violate RICO there must be proof that the individual, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of the enterprise, through the commission of two or more of the predicate crimes." *United States v. Bright,* 630 F.2d 804, 834 (5th Cir. 1980). The predicate crimes include the arson, mail fraud and extortion of this case. 18 U.S.C. § 1961(1). And, when the evidence establishes that the defendants committed during a time period "several acts of racketeering in furtherance of the affairs of the enterprise, an inference of an agreement to do so may be drawn." *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *Bright, supra,* at 834; *United States v. Welch,* 656 F.2d 1039, 1956 n. 24 (5th Cir. 1981).

■ Although it is true, as appellant argues, that the district court dismissed one of her mail fraud counts, there is ample evidence that Comadoll committed the three predicate crimes to further the affairs of the enterprise. The evidence, construed in a light favorable to the government, shows that she allowed the 530 East Altgeld house to be placed in her name by Douglas Caton to shield the latter from suspicion when the house burned and generated insurance proceeds for Indiana Construction. Her complicity in the arson and mail fraud was evidenced by her obtaining insurance from Rosander's company at Douglas Caton's direction, her advance warning to friends that the house would burn, her removal of her belongings, her signing of a release and authorization of payment of the repair bill before repairs had begun, and her signing of a blank proof of loss statement for adjustor Rosander.

The evidence showed Comadoll's further involvement in mail fraud with respect to the house at 1101 Roosevelt. When the checks for property damage and structural damage were issued and Rosander withheld the property check until Dylewski endorsed the structural check, it was Comadoll who forged the endorsement of the structural check co-payee, Colonial Mortgage. Thus she aided and abetted the mail fraud scheme by protecting the inflated structural repair cost from discovery, and according to 18 U.S.C. § 2 is liable as a principal.

Nor is there any doubt that these predicate crimes were committed in furtherance of enterprise affairs. Rosander received kickbacks from Douglas Caton on both jobs, and Douglas Caton received the proceeds of both checks upon his endorsements. Within months, mortgages on both houses were satisfied. It is obvious that the enterprise profited from these illegal acts. Furthermore, upon this evidence, the jury easily could have inferred Comadoll's agreement to participate in the conduct of enterprise affairs.

Comadoll's second argument is that there existed insufficient evidence to sustain her Count III mail fraud conviction since there

is no evidence that she participated directly in the arson or that Colonial Mortgage was not paid in full. There is no merit to this contention.

■■ Of course, to establish mail fraud under § 1341, the government must prove a scheme to defraud and use of the mails to execute the scheme. *United States v. Azzarelli,* 612 F.2d 292, 298 (7th Cir. 1979), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980). Appellant seems to be arguing that since she played no active role in burning the house at 1101 Roosevelt and in contacts with claims adjustor Rosander, and since her only proven involvement was forging the endorsement for Colonial Mortgage, she could not have taken part in the scheme. Appellant takes an unduly narrow view of the scheme and the required extent of involvement. First, the scheme involved not only the arson planned by Douglas Caton at the house, but the submission by Indiana Construction of overinflated repair bills, kickbacks to Rosander for friendly claims handling, and the forging of the endorsement to bring the check proceeds directly to Douglas Caton and Indiana Construction. Second, the extent of her involvement need not be total in the sense that she must participate in every aspect of the scheme. As this Court stated facing a similar argument under 18 U.S.C. § 338 (the predecessor of § 1341):

> One or more persons can originate and carry out a scheme to defraud and any number of persons can operate the plan, each doing his part after the machinery is put in motion; and it would be of no consequence that each and all did not actively participate in the several acts ... if each were aiding and advising in furtherance of the scheme.

*Reuben v. United States,* 86 F.2d 464, 469 (7th Cir. 1936), *cert. denied,* 300 U.S. 671, 57 S.Ct. 513, 81 L.Ed. 877, *reh. denied,* 301 U.S. 712, 57 S.Ct. 782, 81 L.Ed. 1364 (1937). Tellingly, appellant does not argue that her participation was not "knowing," minor though it was.

■ Appellant's contention that Colonial Mortgage was not defrauded can only be called irrelevant. The indictment alleged, and it was proven, that the insurance carrier was defrauded by paying on a grossly inflated repair claim based on an Indiana Construction estimate. The scheme as carried out bribed the adjustor and removed the safeguards usually present to insure that a repair contract goes to a responsible low bidder. Here, the estimate secured by Dylewski, the home owner at 1101 E. Roosevelt, was much lower than that made by Indiana Construction. There is no doubt that the scheme had the purpose of defrauding the insuror and in fact achieved that purpose. Although, of course, it is unnecessary that the victim of the scheme actually be defrauded or suffer loss. *United States v. George,* 477 F.2d 508 (7th Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973).

Comadoll's final argument is confusing. Citing *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) and a law review article calling for a more restrained interpretation of the word "enterprise," Note, 54 Temple L.Q. 76 (1978), appellant argues that there was absolutely no proof that she knowingly or even indirectly participated in the affairs of the enterprise. Noting this Court's recent statement that "[u]nder RICO, it is irrelevant that each defendant participated in the enterprise's affairs through different and unrelated crimes," *United States v. Lee Stoller Enterprises, Inc.,* 652 F.2d 1313, 1319 (7th Cir. 1981), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1982), appellant directs the Court to a dissent in that case. The dissent relied on objected to *United States v. Elliott,* 571 F.2d 880, 902 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978) and its holding that "a defendant's complicity in one type of unlawful activity in the conduct of the affairs of an enterprise can make him criminally responsible under RICO for other and distinct types of unlawful activity of which he has no knowledge or responsibility in fact." *Lee Stoller Enterprises, supra,* 652 F.2d at 1322 (Fairchild, Chief Judge, dissenting in part).

Appellant is confusing two issues: the proof of the existence of an enterprise through proof of acts of racketeering on one hand and proof of conscious agreement to participate in the affairs of the enterprise through proof of individual acts of racketeering on the other. With respect to the first, there is no real question in this appeal of the existence of the enterprise. It was the Catons' business, Indiana Rentals' or Indiana Construction Company's. With respect to the latter, the point has already been addressed, *supra*. However, a few points bear clarification and reiteration.

The issue in *Lee Stoller Enterprises* under discussion was not sufficiency of evidence. It was the propriety of a district court order denying severance. In affirming the district court, the majority cited to *Elliott* to make the point that under RICO, defendants who committed certain acts of racketeering may be "lumped together" with a defendant who committed certain other acts, since they are bound together by a purpose to further the illicit affairs of the enterprise, and not by the purpose of committing one single crime. Thus the propriety of a severance must be viewed against this background.

It is true that the dissent cited appears to take issue with the substance of *Elliott*. However, it needs saying that there still must be evidence from which "we may reasonably infer that each [predicate] crime was intended to further the enterprise's affairs." *Elliott, supra*, 571 F.2d at 902–03. In this particular case, the nature of the predicate crimes committed by Comadoll and the circumstances surrounding their commission support the jury's inference that she "agreed to participate" in the affairs of the enterprise. In another case, that inference may not be reasonable. It simply depends upon the facts.

### III.

Appellant Melton makes essentially three arguments on appeal, which the Court shall address in turn. However, before addressing the arguments, it is necessary to relate an episode which occurred at trial and which creates a backdrop for two of her arguments.

On the morning of May 26, 1981, insurance adjustor Kevin Weinberg testified that eleven gunshots had been fired into his home. Schubert had testified that Caton told him he'd had trouble with an adjustor on a claim and shot at the adjustor's house. Weinberg testified that his insurance company changed its position on a Douglas Caton claim the next day.

During the afternoon of the following day of trial, May 27, 1981, the jury sent a note to the trial judge concerning Melton's drawing of pictures of various people and things in the courtroom during the trial. It stated: "We, the members of the jury, would like to voice our objection to the apparent drawings of pictures of the jury members by defendant, Cheryl Melton." The district judge, out of the presence of the jury, read the note into the record. He stated that the drawing had to stop and solicited from counsel suggestions for handling the jury. Upon suggestions from counsel, the district judge made the pictures part of the record and allowed counsel to address the jury briefly with an explanation. Counselor Bradley, Melton's representative, apologized, assigned the drawing to a nervous habit of Melton's and informed the jury that the pictures had been given to the court. The trial then proceeded.

The next day defendants moved for a mistrial based on the incident. At that time, defense counsel voiced concern that the jury took the episode as a threat. The trial court denied the motion for mistrial.

Proceeding to Melton's arguments, she argues first that the district court abused its discretion in denying her motion for severance. She argues that she was prejudiced by trial alongside Douglas Caton because the jury confused the issue of her guilt or innocence with their alleged fear of Douglas Caton's violent nature. The testimony of Douglas Caton's gunshots, we are told, realized her worst fears and proves the district court erred, since the jury attributed his actions to her.

Appellant correctly informs us that a motion for severance made pursuant to Fed. R. Crim. P. 14 is directed to the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *United States v. Echeles,* 352 F.2d 892, 896 (7th Cir. 1965); *United States v. McPartlin,* 595 F.2d 1321, 1333 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). In addition, a defendant bears the burden of showing prejudice. Denial of severance will be reversed only for the most cogent reasons. *McPartlin, supra; United States v. Kahn,* 381 F.2d 824 (7th Cir. 1967). There is an inference in favor of a joint trial where, as here, a conspiracy is charged and may be proved only by evidence of a series of actions involving a number of people. Fed. R. Crim. P. 8(b); *United States v. Papia,* 560 F.2d 827, 836–37 (7th Cir. 1977).

■ Appellant Melton has failed wholly to address *United States v. Lee Stoller Enterprises, Inc.,* 652 F.2d 1313 (7th Cir. 1981), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1982), in which this court faced a similar argument. The Court stated:

> Defendants here, as in most RICO cases, were alleged to have committed different predicate crimes. But in a trial on RICO charges, a particular defendant may be the victim of spillover testimony regarding other, more violent or heinous, predicate crimes. This can happen because the specific purpose of RICO is to tie together diverse parties and crimes. Under RICO, it is irrelevant that each defendant participated in the enterprise's affairs through different and unrelated crimes.

*Lee Stoller Enterprises, supra,* at 1319. Since they were alleged to have participated in the same offense, furtherance of the enterprise, severance was not required.

Likewise in this case, Count II charged Melton along with all five co-defendants with conspiring to violate 18 U.S.C. § 1962(c). The mere fact that Melton was not charged with each of the predicate crimes listed in Count II does not warrant severance. *Lee Stoller Enterprises, Inc., supra; United States v. Barton,* 647 F.2d 224, 229 (2d Cir. 1981).

■ In this regard, Melton also claims denial of a severance denied her the testimony of Douglas Caton. However, appellant has not even bothered to address the relevant factors a court should consider in that situation. They are: (1) whether the co-defendant's testimony would be exculpatory; (2) whether the co-defendant would in fact testify; and (3) whether the testimony would bear on defendant's case. *United States v. Harris,* 542 F.2d 1283, 1313 (7th Cir. 1976); *United States v. Martinez,* 486 F.2d 15 (5th Cir. 1973). Appellant has made no showing that Douglas Caton's testimony would have exculpated her or that he would have testified. It is hard to see any abuse of discretion in this situation.

■ As for the gunshot testimony, appellant does not contend that she told the trial judge at the time of her motion for severance that this information would come out. Nor did she re-move for severance after the testimony came in. It was only after the picture-drawing episode that the alleged prejudice of the shooting testimony registered on appellant; yet even then she did not seek a severance. Appellant contends that the district court erred by not ordering severance *sua sponte,* citing *Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), for the proposition that the trial judge has a continuing duty to sever if prejudice develops. Appellant miscites *Schaffer.* That case involved a "duty" to scrutinize for prejudice when, at the close of the government's case, the only conspiracy count is dismissed and only substantive charges remain. The only duty incumbent on the district court in this case was to rule correctly upon the severance motions as presented. Since none were presented, the district court did not err.

Melton's second argument is that she was denied due process at trial because her trial counsel's efforts fell below the minimum standard of professional representation. This argument is based on the failure of Melton's counsel to renew the motion for severance after the picture-drawing incident. In counsel's mind, the jury reaction

so strongly evidenced fear of Melton, caused by the association in their minds of Melton with Douglas Caton, that only an incompetent counsel would have failed to renew the motion. The argument is also based on the failure of Melton's counsel to renew the motion at the end of trial, even though the motion was renewed by counsel for Comadoll and James Caton.

Of course, a defendant is entitled to counsel whose performance meets a minimum standard of professional representation. *United States v. Phillips,* 640 F.2d 87, 92 (7th Cir.), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981), but Melton's counsel obviously was not incompetent. First, the record reflects that Melton's counsel made numerous pre-trial motions, made several timely objections during trial, and conducted quality cross-examination. Second, and more importantly, counsel's tactic in playing down the drawing incident and apologizing to the jury was just that, a tactic. Counsel made a quick decision at trial that the best way to handle the note and the jury was to be conciliatory, rather than confrontational, as appellate counsel now contends he should have been. This is no more than Monday-morning quarterbacking a valid decision made by trial counsel. It is telling that in her brief appellant fails totally to discuss and compare the facts of *any* incompetency of counsel cases.

Finally, Melton argues that she was not proven guilty beyond a reasonable doubt, and, that, therefore, the district court erred in denying her motion for acquittal. Again, no cases are cited and appellant relies on her previous argument that the guilt of her co-defendants was erroneously attributed to her.

The jury convicted Melton on Count II, the RICO conspiracy count, only. Reviewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), it is clear there existed sufficient evidence to sustain the guilty verdict. Melton had a close relationship with the enterprise and a close personal relationship with Douglas Caton. She lived in houses provided by Caton in South Bend and Las Vegas, and often with him. She worked for Indiana Construction, handling calls, mail, house rental and repair and repair estimates. Melton directly participated in two fires by driving for Schubert. She indirectly participated in the arson and mail fraud scheme concerning 1657 North Johnson. Title was placed in Melton's name with the intention of burning that residence, and payments and insurance were paid by Caton. When the house burned, Melton filed the claim with the insurance company whose agent accepted kickbacks from Caton. The draft settlement was endorsed by Melton, and Caton used the funds to settle the mortgage. Melton's participating in the predicate crimes constituted evidence from which the jury could infer her agreement to participate in the affairs of the enterprise through a pattern of racketeering activity including mail fraud and two acts of arson. *United States v. Elliott, supra.* As shown above, these acts furthered the enterprise's affairs, since funds were generated which went to the enterprise. Thus there was sufficient evidence to support her conviction and the district court did not err in denying appellant's motion for acquittal.

## V.

In conclusion, the convictions of both Comadoll and Melton are hereby AFFIRMED. Those two parties shall bear their respective costs; costs awarded to the Government.